**Opinion issued September 24, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00990-CV

————————————

**MANFRED FINK, Appellant**

**V.**

**JOANN D. ANDERSON, BETTY BAILEY, DOUG BIRD, ANN BROWN, BRAD BULLOCK, M.D., JIM BYRON, MIKE CLANN, CLAIRE CROWDER, EVAN QUIROS, PAUL FULMER, M.D., ERIC GEIBEL, MARK GRIFFIN, STEVE GERGUIS, STACEY HARVEY, BILL HENDERSON, ALLEN HOLT, LINDA HUDSON, CULLEN KAPPLER, RALPH KIRKLAND, SAM LO, M.D., THOMAS LU, M.D., GAILER MILLER HOLD, MARY QUIROS, LARRY SAMS, BOB SOLBERG, LYNN WHITT, AND CLARISSA WILLIS, M.D., Appellees**

---

On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Case No. 2014-22740

---

# O P I N I O N

Manfred Fink is a physics professor at The University of Texas at Austin. He invented a technology that UT patented and licensed to a private entity, IsoSpec, for development and marketing. UT obtained an equity interest in IsoSpec.

Some of the IsoSpec investors sued Fink, alleging common-law fraud and securities fraud, for statements he allegedly made regarding the efficacy of an instrument he and his co-inventors created that utilized their newly discovered technology. Fink moved for dismissal under the election-of-remedies provision of the Texas Tort Claims Act. His motion was denied.

Fink asserts that the trial court erred by denying his motion because (1) he established that he was within the scope of his employment when he spoke at IsoSpec meetings about his invention and (2) the claims asserted against him could have been brought under the Texas Tort Claims Act and, therefore, are subject to dismissal under Section 101.106(f) of that statute.

We reverse the trial court's order denying Fink's motion to dismiss and render judgment in his favor.

## Background

Manfred Fink has been a physics professor at The University of Texas at Austin for more than 40 years. One of his assigned duties is to conduct research.

Along with fellow UT professor, Philip Varghese, and Michigan professor, Jacek Borysow, Fink utilized the concepts underlying Raman Spectroscopy technology to invent a new technology he termed ANDRaS. According to an affidavit filed by Fink, the professors created prototype machines that utilizes ANDRaS technology.

The patent for the technology is not held by the individual professors, but by their institutional employers. As Professor Varghese explained: "Pursuant to UT policy, I conveyed my rights as an employee of the University to our invention and allowed UT to file patent applications for the technology on behalf of the University." *See* Regents' Rules and Regulations, Rule 90102, sec. 2 (providing that intellectual property developed by UT System employee within course and scope of employment is owned by UT). Though the university owned the patent rights, its rules gave Fink a right to provide input regarding his invention's commercialization. *See id.*, Rule 90101, sec. 7 (stating that creator of intellectual property "may give reasonable input on commercialization of inventions" but that UT has final decision authority "concerning whether and how to develop and commercialize an invention").[1]

UT licensed the technology to a private company for development. The Patent License Agreement is between UT and InnoSpec Technologies, LP. It states that UT, as licensor, "owns or controls the entire right, title, and interest in and to

---

[1]     Fink asked us to take judicial notice of these rules and regulations. The investors filed no objection and in oral argument confirmed that they had no objection.

the Patent Rights," and InnoSpec, as licensee, "desires to secure the right and license to use, develop, manufacture, market, and commercialize the Patent Rights." The agreement lists Fink, Varghese, and Borysow as the "inventors." The inventors are not parties to the agreement. The Agreement grants UT a 5% equity interest in the venture. No equity interest is extended to any of the inventors.

IsoSpec later became the designated licensee of the ANDRaS technology in place of InnoSpec. IsoSpec issued a Private Placement Memorandum (PPM) that sought $1,000,000 in investments in exchange for limited partnership interest in the company. The PPM named Fink as a member of its "Technology and Business Advisory Group" and listed his relationship to IsoSpec as "Co-Inventor and Scientific Developer of the Technologies." Fink did not receive any compensation from Isospec. He averred that he refused Isospec's offer of a written consultation agreement. IsoSpec's PPM disclosed, under the heading "Risk Factors," the following:

> ***IsoSpec is dependent on key relationships.***
> IsoSpec intends to look to the Technology Advisors as a source of counsel and development of new technologies. The Technology Advisors have been developed as a result of personal and business relationships with the General Partners, the inventors of the technologies licensed by IsoSpec, and the Research Institutions. IsoSpec is dependent upon the involvement and contribution of the inventing scientists. The loss of these relationships could have a materially adverse impact upon IsoSpec.

The PPM informed potential investors that "ANDRaS is rugged, inexpensive, small and portable providing onsite analytical capabilities." Further, "[t]wo operating prototype instruments have proven the accuracy and operating capabilities of ANDRaS."

IsoSpec held various meeting with potential investors, including at least some of the plaintiffs. Fink attended at least one of these meetings. Professor Varghese also attended at least one meeting along with Fink and established, through documentation attached to his affidavit, that UT reimbursed some of his travel expenses to meet with IsoSpec. The UT travel voucher form states that Professor Varghese was being reimbursed for travel to IsoSpec in Houston to discuss "commercializing their technology." The UT travel addendum states that he "is driving to Houston, TX to meet with [IsoSpec] to discuss their collaboration on the commercialization of their technology" and to "[h]elp accomplish research objectives."

The role Fink played at the meetings he attended is contested. He averred that "the purpose of the meeting was only to answer technical questions about ANDRaS technology." While there, he "answered very specific scientific questions that certain individuals had about Raman Spectroscopy and ANDRaS technology." Professor Varghese described his role similarly, stating that he attended the

5

meeting to answer technical questions about the technology they developed as UT employees.

Fink averred that he did not participate in drafting the PPM or other marketing materials or receive any compensation from IsoSpec. Additionally, he stated that all of his involvement with IsoSpec was "a result of the work [he was] doing as a professor of physics at UT and UT's licensing of [his] technology to IsoSpec." Accordingly, when he attended the IsoSpec meetings, he "thought it was in the scope and course of [his] responsibilities as a UT professor." Professor Varghese stated the same belief in his affidavit.

The investors describe Fink's role and relationship differently. In their unverified response to Fink's motion to dismiss, they allege that Fink was involved in the development and issuance of the PPM, Fink intentionally engaged in conduct "designed to obtain investments for IsoSpec, a private company," and such actions were not in the scope of his employment at the university. They argue that Fink's involvement at the IsoSpec meeting was not on UT's behalf and did not further any interest of the university. The investors contend that Fink's role was, instead, to solicit investors for the benefit of IsoSpec and his son, Dr. Rainer Fink, who was IsoSpec's Chief Technology Officer.

The investors asserted that Fink must have realized the actual nature of his role:

> It is inconceivable to me that Dr. Manfred Fink would not have known the purpose of the meeting was to obtain investors in IsoSpec specifically based upon what was said at the meeting by IsoSpec representatives, the marketing materials distributed at the meeting, the fact that Dr. Manfred Fink's son was part of the management team of IsoSpec and Dr. Manfred Fink's own detailed discussion of the potential uses of the ANDRaS prototype, if commercialized by IsoSpec.

The investors further claimed that Fink made specific representations to them at IsoSpec meetings, indicating that an ANDRaS prototype had already been created, was fully functional, and had multiple commercial applications. While Fink has confirmed by affidavit that he and his co-inventors created functional prototypes, the investors allege in their unverified response that his assertions are untrue.

After investing in IsoSpec and becoming dissatisfied with the company's performance, the investors sued Fink and his son. They asserted several causes of action: violation of the Texas Securities Act, fraud, misrepresentation, conspiracy, and aiding and abetting securities fraud and common-law fraud.

Fink moved for dismissal under the election-of-remedies provision of the Texas Tort Claims Act, alleging that dismissal was mandatory because he was a governmental employee, he was acting in the scope of his employment at the relevant time, and suit could have been brought under the Act against his employer

7

instead. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f) (West 2011). The trial court denied the motion, and Fink has appealed that order.[2]

The University of Texas has filed an amicus brief to support Fink's contention that he was acting in the scope of his employment when he discussed ANDRaS technology at the IsoSpec meetings. However, to the extent the brief relies on an affidavit submitted after the trial court ruled on Fink's motion, we do not consider it. *See TVMAX Holdings, Inc. v. Spring Indep. Sch. Dist.*, No. 01-14-00304-CV, 2015 WL 1967596, at *4 (Tex. App.—Houston [1st Dist.] Apr. 30, 2015, no pet.) (mem. op.) (affidavit submitted to appellate court after trial court ruled held to not be part of appellate record and, therefore, was not considered on appeal).

## Standard of Review

Generally, we review a trial court's order on a motion to dismiss under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). However, the proper standard of review is not necessarily determined by the caption of the motion to which the order relates, rather it is determined by the substance of the issue to be reviewed. *Singleton v. Casteel*, 267 S.W.3d 547, 550 (Tex. App.—Houston [14th Dist.] 2008, pet.

---

[2] Interlocutory appeal is available for the denial of a state employee's motion for summary judgment asserting immunity. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(5) (West 2015).

denied). Here, the motions to dismiss raised the issue of immunity. *See id.*; *see also Franka v. Velasquez*, 332 S.W.3d 367, 371 n.9 (Tex. 2011) (stating that Section 101.106 confers immunity in some instances to employees of governmental units). If immunity applies, the trial court lacks subject-matter jurisdiction over the case. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *see also Univ. of Tex. Health Sci. Ctr. at San Antonio v. Webber–Eells*, 327 S.W.3d 233, 240 (Tex. App.—San Antonio 2010, no pet.). Subject-matter jurisdiction is a question of law which we review de novo. *Miranda*, 133 S.W.3d at 226. Likewise, matters of statutory construction are reviewed under a de novo standard. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009); *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003).

We may not presume the existence of subject-matter jurisdiction; the burden is on the plaintiffs to allege facts affirmatively demonstrating the trial court's subject-matter jurisdiction over the case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44, 446 (Tex. 1993); *Anderson v. Bessman*, 365 S.W.3d 119, 123–24 (Tex. App.—Houston [1st Dist.] 2011, no pet.). In deciding whether the court has subject-matter jurisdiction, we consider the plaintiffs' pleadings and the evidence pertinent to the jurisdictional inquiry, without regard to the case's merits. *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002); *Anderson*, 365 S.W.3d at 124.

**Sovereign Immunity and Section 101.106(f) Dismissal**

The investors have alleged various tort-based claims against Fink. First, they alleged that Fink violated the Texas Securities Act because he "engaged in fraud by intentionally failing to disclose material facts related to the operation and performance of ANDRaS and the future development of it into a commercial product," and also by "misrepresent[ing] one or more material facts . . . in connection with the offer for sale and sale of limited partnership interests" in IsoSpec. Second, they asserted common-law fraud claims for the same failures to disclose and misrepresentations. Third, they alleged that Fink conspired with the IsoSpec founders "to create IsoSpec and engage in securities fraud and common-law fraud by developing and issuing the PPM and making numerous other verbal misrepresentations in an effort to unlawfully appropriate financial contributions from investors in exchange for limited partnership interests." And fourth, they alleged that Fink aided and abetted the IsoSpec founders "to commit securities fraud and common law fraud."

In reviewing the trial court's order denying Fink's motion to dismiss under the election-of-remedies provision of the Tort Claims Act, we consider whether he conclusively proved that he met all three of the statute's requirements: (1) he was a governmental unit employee at the relevant time; (2) the complained-of conduct was within the general scope of his employment with a governmental unit; and

(3) the plaintiffs' suit could have been brought under the Tort Claims Act against Fink's governmental employer. TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f); *Franka*, 332 S.W.3d at 369; *Anderson*, 365 S.W.3d at 124; *Mauk v. Pipe Creek Water Well, LLC*, No. 04-14-00906-CV, 2015 WL 2405338, at *2 (Tex. App.— San Antonio May 20, 2015, no pet.) (mem. op.). It is undisputed that the University of Texas is a governmental unit and that it was Fink's employer at the relevant time. Accordingly, we turn to whether Fink has established the two remaining statutory requirements for dismissal under Section 101.106(f).

## A.     General scope of employment

The Tort Claims Act defines "[s]cope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to an employee by competent authority." TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(5) (West Supp. 2014); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994) ("An official acts within the scope of her authority if she is discharging the duties generally assigned to her.").

### 1.     Conduct may serve any purpose of employer

The Texas Supreme Court has looked to the Restatement for "additional clarity" on the term "scope of employment." *See Alexander v. Walker*, 435 S.W.3d 789, 792 (Tex. 2014) (referring to RESTATEMENT (THIRD) OF AGENCY § 7.07(2)

(2006)); *Franka*, 332 S.W.3d at 381 n.63 (citing same). The Restatement provides a negative definition: "An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." RESTATEMENT (THIRD) OF AGENCY § 7.07(2).

Thus, when an employee engages in conduct "for the sole purpose" of furthering someone else's interests and not his employer's, the conduct is outside the employee's scope of employment. *See id.*, cmt. b; *see also Arbelaez v. Just Brakes Corp.*, 149 S.W.3d 717, 722–23 (Tex. App.—Austin 2004, no pet.) (holding that employer failed to prove as matter of law that employee's "breakfast run" was for purely personal purposes and not meant to further the employer's interest to any appreciable extent).

### 2. Conduct may escalate but not deviate

Conduct that serves any purpose of the employer is within the scope of employment even if the conduct escalates beyond that assigned or permitted. *See* RESTATEMENT (THIRD) OF AGENCY § 7.07(2), cmt. b. So, for example, when an employee's job duties include making statements to prospective customers to induce them to buy from the employer, intentional misrepresentations may be within the scope of employment. *Id.*; *cf. Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96, 99 (Tex. 1994) (noting that insurance agent had authority to make

representations about insurance policies and misrepresentations did not take conduct outside scope of authority).

Similarly, "if the employer places his employee in a position that involves the use of force, so that the act of using force is in the furtherance of the employer's business, the employer can be found liable . . . even if the employee uses greater force than is necessary." *Knight v. City Sts., L.L.C.*, 167 S.W.3d 580, 583–84 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (concluding that plaintiff failed to raise fact issue on whether employees were authorized to use force); *see ANA, Inc. v. Lowry*, 31 S.W.3d 765, 770 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (stating that "an employer will be held liable for its employee's assault on a third party only if that assault stems directly from the employee's exercise (however inappropriate or excessive) of a delegated right or duty.").

But conduct that is better viewed as a deviation from an assigned task instead of an escalation beyond what was authorized is not within the employee's scope of employment. *See Zarzana v. Ashley*, 218 S.W.3d 152, 159–60 (Tex. App.—Houston [14th Dist.] 2007, pet. struck) (automotive service station employee who sold counterfeit inspection sticker held not within scope of employment because service station did not conduct inspections and act of selling counterfeit stickers was not "of the same general nature as [the conduct] authorized or incidental to the conduct authorized" by the employer).

13

### 3. Intentional torts can fall within scope of employment

As an initial matter, the investors argue that a fraud claim should not be subject to Section 101.106(f) dismissal because intentionally tortious conduct is "almost never" held to be within the scope of authority granted an agent by his principal. At oral argument, through hypotheticals, they gave two examples of intentional torts they assert would not be subject to immunity: assault and theft. Yet both of those intentional torts have been held to involve conduct within a governmental employee's scope of employment when they take place while the employee is engaged in conduct to further an interest of his employer and the tortious act is more of an escalation of—rather than a deviation from—his job duties.

### a. Intentional tort of assault

In *Alexander v. Walker*, police officers were sued for assault, conspiracy, slander, false arrest, false imprisonment, and malicious prosecution. 435 S.W.3d at 790. The claims arose from the officers' conduct while arresting the plaintiff on two separate occasions. *Id.* The Texas Supreme Court reversed the denial of the police officers' Section 101.106(f) motion to dismiss, holding that engaging in an arrest is conduct that is generally within an officer's scope of employment; it is not an independent course of conduct that fails to serve any purpose of the employer.

14

*See id.* at 792. Accordingly, the Court rendered judgment in the officers' favor on

the assault and other tort claims. *See id.*[3]

---

[3] In assault cases outside of the context of governmental immunity, the results have been the same. In these cases, the issue is whether the employer can escape liability under normal respondeat superior principles by arguing that intentional torts do not fall within the scope of employment. Courts have held that the employer is liable if the tortious conduct "is of the same general nature as that authorized or incidental to the conduct authorized." *Durand v. Moore*, 879 S.W.2d 196, 199 (Tex. App.—Houston [14th Dist.] 1994, no writ) (holding that evidence supported conclusion that doorman's "overzealous enforcement" of nightclub's admittance policies, which led to assault of patron, was conduct within doorman's scope of employment); *Cowboys Concert Hall-Arlington, Inc. v. Jones*, No. 02-12-00518-CV, 2014 WL 1713472, at \*9–10 (Tex. App.—Fort Worth May 1, 2014, pet. denied) (mem. op.) (affirming that nightclub is vicariously liable for assault by bouncer after concluding that bouncer was within scope of employment because bouncer was instructed to restrain patrons if necessary and to "handle" fights, which occurred nightly). An assault "committed in the accomplishment of a duty entrusted to the employee, rather than because of personal animosity, may render the employer liable." *Wrenn v. G.A. T.X. Logistics, Inc.*, 73 S.W.3d 489, 494 (Tex. App.—Fort Worth 2002, no pet.)

However, an assault that is unrelated to the assigned duties of the employee is not within the scope of employment. *See Ogunbanjo v. Don McGill of W. Houston, Ltd.*, No. 01-13-00406-CV, 2014 WL 298037, at \*3–4 (Tex. App.—Houston [1st Dist.] Jan. 28, 2014, no pet.) (mem. op.) (concluding that car salesman who offered to drive service-department customer back to her home was not within scope of his employment when he assaulted her in his personal vehicle); *Int'l & G.N.R. Co. v. Anderson*, 17 S.W. 1039, 1040–41 (Tex. 1891) (stating that train passenger suing train company for tortious conduct of its employee who forcibly removed him from train could prevail on argument that employee was in scope of employment only if it was within employee's duties to remove passengers, but evidence presented in that particular case was that brakeman did not have that authority and, therefore, was not acting within scope of employment); *Galveston H. & S. A. Ry. Co. v. McMonigal*, 25 S.W. 341, 342 (Tex. Civ. App. 1893).

In sum, "an employer will be held liable for its employee's assault on a third party only if that assault stems directly from the employee's exercise (however inappropriate or excessive) of a delegated right or duty." *ANA, Inc. v. Lowry*, 31 S.W.3d 765, 770 (Tex. App.—Houston [1st Dist.] 2000, no pet.).

### b.     Intentional tort of theft

Employees alleged to have committed theft have also been held to be acting within scope of employment. In *Lopez v. Serna*, 414 S.W.3d 890, 894–95 (Tex. App.—San Antonio 2013, no pet.), the appellate court held that jail officials acted within their scope of employment because they were performing duties generally assigned to them when they confiscated an inmate's property. Whether they intentionally and unlawfully appropriated the property did not change the conclusion that the general nature of their duties included confiscating inmate property. *See id.*

### c.     Intentional tort of fraud

In addition to these cases involving dismissal of theft and assault claims, this Court has held that fraud claims brought against university administrators were subject to Section 101.106(f) dismissal as well. In *Anderson v. Bessman*, UTMB medical school faculty members who had been fired following post-hurricane budget cuts brought suit against various school officials, alleging tortious interference with their employment relationships, negligent misrepresentation, negligence, fraud, and civil conspiracy. 365 S.W.3d at 123. They alleged that the school officials did not make the firing decision based on applicable rules and regulations but, instead, on "financial incentives and personal animosities" and in bad faith. *See id.* The school officials sought dismissal under Section 101.106(f),

16

but their motions were denied. *See id.* at 126. We reversed because it was within the school officials' generally assigned duties to evaluate faculty members' performance and the school officials had been specifically asked to make recommendations regarding which faculty should be fired as part of the post-hurricane budget-cut process. *See id.* at 125. Thus, the fraud claim was subject to Section 101.106(f) dismissal because the actions taken by the governmental employees—even though pleaded as an intentional tort—were within their scope of employment. *See id.*

### d.  Other intentional torts

This Court, likewise, has held that a mayor accused of slander and malicious prosecution—two other intentional torts—acted within his scope of employment when he made negative comments about a city employee's job performance to another mayor because it was undisputed that responding to employment verification requests was a task generally assigned to the mayor. *Hopkins v. Strickland*, No. 01-12-00315-CV, 2013 WL 1183302, at *3 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.) (stating that "an act may still be within the scope of the employee's duties even if the specific act that forms the basis of the civil suit was wrongly or negligently performed, so long as the action was one related to the performance of his job." (citing *Chambers*, 883 S.W.2d at 658)).

Most telling, the Texas Supreme Court has rendered judgment for a governmental employee after concluding that claims against him for intentional infliction of emotional distress and conspiracy to intentionally inflict emotional distress were subject to dismissal under Section 101.106(f). *Newman v. Obersteller*, 960 S.W.2d 621, 622–23 (Tex. 1997); *see also Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 659 (Tex. 2008) (stating that "all tort theories," including these intentional torts, "are assumed to be 'under [the Tort Claims Act]' for purposes of Section 101.106." (brackets in original)).

Thus, we reject the investors' argument that an allegation of an intentional tort forecloses the possibility that Fink was acting within his scope of employment, for purposes of Section 101.106(f) dismissal analysis. We next consider whether Fink's alleged conduct fell within his scope of employment.

### 4. What conduct is being evaluated

In arguing that Fink acted outside his scope of employment, the investors describe his conduct as "soliciting investments for a private company and committing fraud in the course of such solicitations . . . ." The investors rely on older cases for the proposition that "unlawful or unauthorized actions" cannot be within the scope of a governmental employee's official duties. These cases, including *Bagg v. University of Texas Medical Branch*, 726 S.W.2d 582, 585 (Tex.

App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.), predate the Texas Supreme Court's *Alexander* opinion and our *Anderson* and *Hopkins* opinions.

Fink described his conduct quite differently. He contended that, "[a]s the inventor of the ANDRaS prototypes, [he] from time to time assisted IsoSpec in answering certain questions that they had about the technology and [his] research." These were "very specific scientific questions that certain individuals had about Raman Spectroscopy and ANDRaS technology." He averred that "the purpose of the meeting was only to answer technical questions" about his invention. Professor Varghese averred similarly. He stated that he attended IsoSpec meetings, at least partially at UT's expense, "to assist IsoSpec, the University's licensee, in answering very specific scientific questions related to our invention."

Thus, we are presented with two very different characterizations of Fink's involvement: answering specific scientific questions about a technology developed as a UT research professor versus intentional, fraudulent solicitation of investments for the benefit of a private company where a close family member worked.

The Texas Supreme Court has noted the difficulty in analyzing immunity when the challenged conduct is phrased in terms tied to the specific wrong alleged. *See Chambers*, 883 S.W.2d at 653–54. In that case, the plaintiffs' son was severely injured during a high-speed police chase, and the parents sued the police officers for negligence. *Id.* at 652. The officers moved for summary judgment based on an

assertion of official immunity. *Id.* The court of appeals held that the officers did not have discretion "to drive without due regard for the safety of all persons using the highway." *Chambers v. City of Lancaster*, 843 S.W.2d 143, 149 (Tex. App.—Dallas 1992), *rev'd*, 883 S.W.2d 650 (Tex. 1994). The Texas Supreme Court disagreed with the appellate court's analysis and held that the focus should have been on whether the police officers were performing a discretionary function (when they allegedly acted wrongfully), not on whether they had discretion to do an allegedly wrongful act while discharging that function. *Chambers*, 883 S.W.2d at 653.

The Texas Supreme Court described the officer's conduct broadly. Instead of asking whether the officers had discretion to driving unsafely, as the appellate court had done, the Court considered whether "engaging in a high-speed chase" was a discretionary act and held that it was. *See id.* at 653–55. The Court explained that the appellate court's use of a more specific description linked to the alleged wrong "frustrates official immunity's very function" because it "inexorably leads to the [at times incorrect] conclusion that an officer is not entitled to immunity if the officer is negligent." *Id.* at 655.

More recent cases likewise have broadened the focus to ask whether the general conduct was within the scope of employment instead of whether the specific act was somehow wrongful. We have already discussed several of these

cases while analyzing whether intentional tort claims can fall within the scope of employment. *See Alexander*, 435 S.W.3d at 790, 792 (in evaluating whether officers sued for assault were acting within scope of employment, generally considering act of securing an arrest instead of tort-based act of assaulting arrestee); *Anderson*, 365 S.W.3d at 125–26 (in evaluating whether school officials were acting within general scope of employment, considering their act to be general act of evaluating faculty performance instead of tort-specific act of fraudulently removing faculty); *Lopez*, 414 S.W.3d at 894–95 (concluding that jail officials acted within scope of employment when they confiscated inmate's property because confiscation was within general nature of duties even if they intentionally and unlawfully appropriated this particular property); *cf. Cantey Hanger, LLP v. Byrd*, No. 13-0861, 2015 WL 3976267, at *6–7 (Tex. June 26, 2015) (rejecting argument that intentional misrepresentations are outside retained attorney's scope of employment and holding that general type of conduct engaged in was within scope even if defendant performed in wrongful manner); *Lenoir v. Marino*, No. 01-13-01034-CV, 2015 WL 4043248, at *12–13 (Tex. App.— Houston [1st Dist.] July 2, 2015, no pet. h.) (holding that physician overseeing medical care provided by resident was within general scope of employment although alleged to have committed Medicaid fraud related to that care).

Here the pertinent question is not, as the investors state, whether fraudulent solicitation was within Fink's scope of employment. Rather, it is whether his general conduct—speaking about his invention at the IsoSpec meeting—was conduct that served any purpose of his employer. *See Alexander*, 435 S.W.3d at 792 (analyzing whether government employee was engaged in conduct intended "to serve any purpose of" his employer to determine whether such conduct was within scope of employment); *cf. Chambers*, 883 S.W.2d at 658 ("An official acts within the scope of her authority if she is discharging the duties generally assigned to her.").

5.    **Fink established that conduct was within general scope of employment**

Fink spoke at a business meeting about a technology he co-discovered and a device he co-invented. The investors argue that speaking at investor meetings is not within the range of a university professor's duties, but their assertion is not verified or supported by evidence. Fink's unrebutted evidence demonstrated that his job duties included research, creating new intellectual property, and assisting in the commercialization of such UT-owned technology. The alleged fraud occurred while he was discussing the invention he co-created as a UT professor at meetings held by a company of which his employer, UT, held partial equity ownership. Fink was not paid by IsoSpec to participate in the meetings or to perform any services for it. Fink's co-inventor, another UT professor, also attended a meeting. Both

22

answered technical questions about their invention. And the colleague's travel expenses were reimbursed by UT with this stated justification: "Help accomplish research objectives."

We conclude that speaking at such a meeting was conduct within the general scope of Fink's employment. Commenting on the efficacy of a UT-patented device was not "an independent course of conduct" that failed to "serve any purpose of [his] employer." *See Alexander*, 435 S.W.3d at 792; *see also* RESTATEMENT (THIRD) OF AGENCY § 7.07(2). Rather, Fink's actions served a purpose of his employer because UT held an equity interest in IsoSpec, which was developing and marketing UT's patented technology.

Next, the investors contend that it is "inconceivable" that Fink would not have realized that the true purpose of speaking at the meeting was to obtain investors, not to provide scientific insight. Even assuming Fink spoke at the meeting with the intent to assist IsoSpec in garnering investments, given UT's partial ownership of IsoSpec, it remained within his employer's interest that he speak at the meetings. *See Morrow v. Daniel*, 367 S.W.2d 715, 718 (Tex. App.— Dallas 1963, no writ) (fraudulent misrepresentations made by promoter of corporate stock to induce others to purchase shares were made within scope of employment); *Alexander*, 435 S.W.3d at 792.

23

Finally, the investors contend that Fink acted outside of the scope of his employment because his efforts to solicit investors were in furtherance of his personal goals and those of his son, an IsoSpec officer. But co-existing motivations do not remove an employee's actions from the scope of his employment so long as the conduct also serves a purpose of the employer. *See Anderson*, 365 S.W.3d at 125–26. An activity may serve the employer's purposes while simultaneously benefitting the employee or even a third party and still qualify as conduct within the scope of employment. *See id.*; *Arbelaez*, 149 S.W.3d at 722 (employee sent on errand by employer to buy breakfast for himself and co-workers held within scope of employment); *Dictaphone Corp. v. Torrealba*, 520 S.W.2d 869, 872 (Tex. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.) ("Conduct may be within the scope of employment, although done in part to serve the purposes of the servant or of a third person." (citing RESTATEMENT (SECOND) OF AGENCY § 236 (1958))); *Golgon, Inc. v. Hart*, 893 S.W.2d 562, 568 (Tex. App.—Corpus Christi 1994, writ denied) (stating that employee's actions may be within scope of employment even if private matters are mixed with business errand); *Josey-Miller Co. v. Sheppard*, 357 S.W.2d 488, 490 (Tex. App.—Beaumont 1962, no writ) (stating that employee may be within scope of employment even when "there is a mingling of the master's business with the servant's business").

In conclusion, the evidence establishes that both UT professors who created the patented technology attended IsoSpec meetings. UT was a part-owner of IsoSpec. Fink's discussions of the efficacy of his invention at the IsoSpec meetings served a purpose of his equity-interest employer, even if they also served his interests or those of his son. *See Anderson*, 365 S.W.3d at 125. Accordingly, we hold that Fink has established that he acted within the general scope of his employment. We turn next to the third requirement for Section 101.106(f) dismissal—that the action could have been brought against Fink's employer under the Tort Claims Act.

## B.     Claims could have been brought under Tort Claims Act

The investors brought common law tort claims against Fink, as well as a claim under the Texas Securities Act. While apparently conceding that the common-law tort claims are claims that "could have been brought under the [Tort Claims] Act," the investors present two arguments why their Securities Act claim is different. First, they contend that Section 101.106(f) refers only to common-law tort actions, not statutory claims like violations of the Texas Securities Act. Second, they argue that the Securities Act independently waives immunity and, as a result, a claim brought under it could not have been brought under the Tort Claims Act.

The Texas Supreme Court has held that a claim is considered one that "could have been brought" under the Tort Claims Act if it (1) "is in tort" and (2) is not brought "under another statute that independently waives immunity," even if the particular tort alleged is one for which immunity has not been waived. *Franka*, 332 S.W.3d at 379, 381.

### 1. Securities Act violation is a tort claim

The Section 101.106(f) requirement that the claim be a "tort claim" is not limited to negligence and other common law torts. *See Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 356–57 (Tex. 2013) (stating that claim could have been brought under Tort Claims Act if "plaintiff had a tort claim to assert against the government"); *Williams v. Nealon*, 394 S.W.3d 9, 11 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (noting that "any tort action" is one that could have been brought under Tort Claims Act). As the Texas Supreme Court stated in *Franka*, any tort claim against the government is brought "under" the Act for purposes of Section 101.106(f), even if the Act does not waive immunity. 332 S.W.3d at 375. A "tort claim" can include intentional torts. *Alexander*, 435 S.W.3d at 792. A "tort claim" can also include claims that are tort based but pleaded as statutory violations. *Lopez*, 414 S.W.3d at 894.

The focus is on whether the claim "sounds in tort," not the mechanism for prosecuting the claim. *See Rodriguez v. Christus Spohn Health Sys.*, 628 F.3d 731,

26

735–37 (5th Cir. 2010) (rejecting argument that Tort Claims Act is limited to "common law torts only" and holding that various statutory claims "sound in tort" and, therefore, may be subject to Section 101.106(f) dismissal, including claims under Medical Liability Act, Sexual Exploitation by Mental Health Services Provider Act, and Patient's Bill of Rights). Thus, for example, statutory theft claims have been held to constitute claims that could have been brought under the Tort Claims Act. *Lopez*, 414 S.W.3d at 894 (holding that claim brought under Texas Theft Liability Act is one that could have been brought under Tort Claims Act); *Mason v. Wood*, No. 09-12-00246-CV, 2013 WL 1088735, at *2 (Tex. App.—Beaumont Mar. 14, 2013, no pet.) (mem. op.) (same); *cf.* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (West 2011) (waiving immunity for certain categories of damages proximately caused by conduct described broadly to include "wrongful act or omission").

Artful pleading will not change the tort nature of the claim. *See Mason*, 2013 WL 1088735, at *2 (while analyzing whether theft claim was one that could have been brought under Tort Claims Act, stating that "plaintiff cannot, through artful pleading, make a common law tort claim a statutory claim under the Theft Liability Act.").

The investors sued Fink for misrepresentation and fraud, which are tort theories of liability. They also sued for violation of the Securities Act based on the

same misrepresentations and omissions. We conclude that the allegation that Fink violated the Securities Act by making material misrepresentations about the ANDRaS technology "sounds in tort" and is, therefore, considered a tort claim, for purposes of Section 101.106(f) dismissal analysis, even though the allegation is pleaded as a statutory violation. *Cf. Navarro v. Grant Thornton, LLP*, 316 S.W.3d 715, 718 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (characterizing claims brought under Texas Securities Act as "tort claims").

## 2. Securities Act does not independently waive immunity

The second requirement for a Securities Act violation to be a claim that could have been brought under the Tort Claims Act is that the statute not contain an independent waiver of immunity. *Alexander*, 435 S.W.3d at 792; *Franka*, 332 S.W.3d at 381 (holding that claim brought "under another statute that independently waives immunity" is not subject to Section 101.106(f) dismissal); *Kelemen v. Elliott*, 260 S.W.3d 518, 522 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (holding that alleged violations of Texas Whistleblower Act and Texas Commission on Human Rights Act were not claims that could have been brought under Tort Claims Act because each contained independent waiver of immunity); *Hamilton v. Pechacek*, No. 02-12-00383-CV, 2014 WL 1096018, at *5 n.7 (Tex. App.—Fort Worth Mar. 20, 2014, no pet.) (mem. op.) (stating that "'under this

28

chapter' language does not include claims based on alternate, independent statutes that waive sovereign or governmental immunity").

The Texas Supreme Court has consistently maintained that it is within the Legislature's sole province to waive sovereign immunity. *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002); *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 409 (Tex. 1997). Legislative consent to sue the State must be expressed in "clear and unambiguous language." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003); *Univ. of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 177 (Tex. 1994). This requirement is codified in Government Code Section 311.034, which provides that "a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language." TEX. GOV'T CODE ANN. § 311.034 (West 2013).

At times the Legislature has clearly stated its intent to waive immunity. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE ANN. § 110.008 (West 2011) (providing that "sovereign immunity to suit and from liability is waived . . . ."). But "magic words" are not required. *Taylor*, 106 S.W.3d at 697. The Texas Supreme Court has provided four "aids" to inform our analysis of whether the Legislature has clearly and unambiguously waived immunity in the absence of a succinct statement affirmatively stating so:

29

1) An indication that the Legislature requires that the State be joined in a lawsuit for which immunity would otherwise attach indicates a waiver of immunity;

2) The Legislature often enacts measures that provide an objective limitation on the State's potential liability when waiving immunity;

3) Waiver must be "beyond doubt" even if it is not "a model of 'perfect clarity'"; and

4) Ambiguities are resolved to retain immunity.

*Id.* at 697–98; *see Magnolia Petroleum Co. v. Walker*, 83 S.W.2d 929, 934 (Tex. 1935) (stating that "ambiguity or obscurity" in a statute will operate in favor of the State).

The Securities Act does not contain a provision requiring that the State be joined in a suit brought under the Act. Neither does the statute contain a provision limiting the amount of damages that may be recovered from a governmental entity. *See Taylor*, 106 S.W.3d at 701–02 (noting absence of liability limits in Patient's Bill of Rights statute). The absence of a liability cap for governmental entities in the Securities Act is particularly relevant given that there is a limit on liability for a different category of potential defendant: small business issuers. *See* TEX. REV. CIV. STAT. ANN. art. 581-33(N).

Further, the Act provides that any rights and remedies it provides are in addition to other existing remedies, including exemplary or punitive damages. *Id.* art. 581-33(M). The Texas Supreme Court has expressed "skepticism that the Legislature intended to waive sovereign immunity by mere implication" when the

statute being analyzed provides for exemplary damages. *Taylor*, 106 S.W.3d at 701–02 (analyzing Patient's Bill of Rights statute). Thus, the first two areas of analysis support the conclusion that the Securities Act does not independently waive immunity.

The two remaining factors consider whether waiver is established "beyond doubt" or, instead, if there is an ambiguity in the statute. The investors argue that the Securities Act clearly waives immunity through incorporation of a defined term. The Act provides that a "person" who sells securities can be liable for misrepresentations of material facts. TEX. REV. CIV. STAT. ANN. art. 581–33(A)(2). The Act defines "person" to include "a government, or a political subdivision or agency thereof." *Id.* art. 581–4(B). However, Government Code Section 311.034 strongly negates this definition's relevance by providing that inclusion of a governmental entity within a "person" definition "does not indicate legislative intent to waive sovereign immunity unless the context of the statute indicates no other reasonable construction." TEX. GOV'T CODE ANN. § 311.034 (West 2013). The Section 4 "person" definition does not establish a waiver "beyond doubt" under the third *Taylor* factor. At most, it creates an ambiguity and, under the final *Taylor* factor, counsels against a conclusion of waiver. *See Taylor*, 106 S.W.3d at 697, 701 (stating that ambiguity precludes finding of unmistakable legislative

31

intent to waive sovereign immunity and requiring that waiver be unambiguous and "beyond doubt").

Because a violation of the Securities Act "sounds in tort" and the four *Taylor* factors do not support the conclusion that the Legislature waived immunity under the statute, we conclude that a violation of the Securities Act is a claim that "could have been brought under [the Tort Claims Act]" for purposes of analyzing a Section 101.106(f) motion to dismiss, just like the investors' other claims.

## Conclusion

Having concluded that Fink established that he was within the scope of his employment and that the claims against him are ones that could have been brought under the Tort Claims Act, we sustain his first and second issues. Because the evidence established Fink's right to dismissal and the investors failed to raise a fact issue on that issue, the proper rendition is to reverse the trial court's judgment and render judgment for Fink. *See Lund v. Giauque*, 416 S.W.3d 122, 124 (Tex. App.—Fort Worth 2013, no pet.); *Leonard v. Glenn*, No. 04-08-00200-CV, 2011 WL 3610420, at *1 (Tex. App.—San Antonio Aug. 17, 2011, no pet.) (mem. op.). Accordingly, we reverse the trial court's order denying Fink's motion to dismiss, dismiss the claims against him, and render judgment in his favor.

Harvey Brown
Justice

Panel consists of Justices Jennings, Brown, and Lloyd.