**Opinion issued October 27, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-01001-CV

_____

**FADI KRAIDIEH, Appellant**

**V.**

**KAREN NUDELMAN, Appellee**

---

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-14736**

---

## MEMORANDUM OPINION

While off-duty, Fadi Kraidieh, a City of Houston police officer, purportedly attempted to detain Karen Nudelman and three of her friends. Nudelman later sued Kraidieh in his individual capacity for assault. In a plea to the jurisdiction, or in the alternative, motion for summary judgment, Kraidieh argued to the trial court

that he was entitled to dismissal under the election-of-remedies provision of the Texas Tort Claims Act because his conduct was within the general scope of his employment and the suit could have been brought against his governmental employer, the City of Houston. The trial court denied Kraidieh's plea to the jurisdiction, and this interlocutory appeal followed. We reverse the trial court's order denying the plea to the jurisdiction and render judgment dismissing the case.

## Background

One Halloween weekend, Nudelman, then a law student and a resident of the Millennium Greenway Apartments, spent the evening with her roommate, Amanda D' Angelo, and two male friends, Bradley Schield and Brandon Alexander. In the early morning hours of October 30, 2010, the four decided to go to the apartment complex hot tub.

Kraidieh and his wife, Kelly Bates, are also residents of the Millennium Greenway Apartments and both are employed by the City of Houston Police Department. Kraidieh was off-duty and home asleep that evening. He was awakened by loud noises from the apartment complex pool area around what he guessed was 4:30 a.m.[1] Kraidieh claimed that he heard female screams from the pool area, and, thinking someone was in distress, he went to investigate.

---

[1] Scottie Hawkins, also a resident at Millennium Greenway Apartments, lived in a unit facing the apartment complex pool area, and he recalled being similarly

Kraidieh averred that he approached the pool area and saw four adults—Nudelman, D'Angelo, Schield, and Alexander—in the hot tub, one of whom was drinking directly from a clear bottle of alcohol. He noted that one of the women in the group had a beer in her hand and appeared intoxicated. Though he was wearing a Houston Police t-shirt and claimed to have his HPD badge around his neck, Kraidieh did not identify himself as a police officer. According to Kraidieh, he told the group that they needed to leave because they were causing a disturbance, drinking in public, and occupying the pool area outside allowable hours. D'Angelo asked Kraidieh if they could have a couple minutes to wrap up. Believing that the group was being compliant, Kraidieh said, "okay," and returned to his apartment.

According to Kraidieh, he heard the same screaming noise from the pool area some 15 to 20 minutes later. Again, he went down to investigate. As he walked, he phoned his wife, Deputy Bates, who held an approved extra job doing private security for the apartment complex. When he arrived at the pool area, he found the same group in the hot tub, and he asked which apartment they lived in. Kraidieh averred that one of the women responded, "We are not telling you; we do not want to get in trouble." Only then did Kraidieh identify himself as a police officer, just before he again told the group to leave the pool area. Kraidieh recalled

awakened by loud noises from that area. However, Hawkins thought he was awakened around 2:00 or 3:00 a.m.

3

that one of the women responded, "What the f- is your problem, leave us alone!", to which one of the men echoed, "Yeah, what the f- is your problem, we are not leaving." Believing that the four apparently intoxicated adults in the hot tub were belligerent and may be a danger to themselves or others, Kraidieh decided to detain all four individuals until Deputy Bates arrived. He did so notwithstanding the fact that he was without his duty weapon, handcuffs, and police identification.

Kraidieh averred that, in attempting to detain the four individuals, he grabbed one of the men by the wrist and tried to forcibly remove him from the hot tub, which led to Nudelman telling him to leave her friend alone and allegedly punching Kraidieh in the head. Kraidieh explained that he tried to push her away to prevent her from striking him again, but maintains that he did not slap her and did not see her fall or hit her head. Around that time, Kraidieh noted that Nudelman called 911 and told the dispatcher that a man—Kraidieh—was impersonating a police officer. Kraidieh claimed that, afterwards, Nudelman began repeatedly slapping his face and kicking at him until Schield pulled her away. With that, Kraidieh decided to retreat to his apartment to get his handcuffs. As he left, the group asked for his badge number, and, according to Kraidieh, he pointed toward his neck and called out his badge number.

While Nudelman agreed that Kraidieh was wearing a t-shirt and jeans when he first interacted with the group, she maintained that he did not have a badge

4

around his neck at that time. Schield also testified that Kraidieh did not have a badge when he first approached the group. Nudelman described the badge Kraidieh was wearing around his neck on his second approach as appearing to be "plastic, silver." Nudelman recalled Kraidieh coming down screaming and yelling, "Get the F out of the pool," "Go the F home," and "Get the F out of here." According to Nudelman, Alexander waded toward Kraidieh and asked what his problem was and things escalated from there. Though Kraidieh denied striking Nudelman or seeing her fall, Nudelman maintains that Kraidieh picked her up and threw her to the ground.

HPD's Sergeant L.G. Mikel responded to the scene at 5:18 a.m. After meeting Kraidieh near the apartment complex lobby, Sergeant Mikel walked with him to his apartment, where they waited for Deputy Bates as Kraidieh recounted his version of events. Though Sergeant Mikel believed Kraidieh had discretion to arrest the group, Kraidieh told him he did not wish to pursue the matter. Nonetheless, accompanied by Deputy Bates, Sergeant Mikel then went to Nudelman's apartment.

Sergeant Mikel described Nudelman and her friends as intoxicated, an opinion he formed based on the smell of alcohol, slurred speech, and argumentativeness. Nudelman recalled being shocked and in disbelief when Sergeant Mikel told her that Kraidieh was indeed an HPD officer. According to

Nudelman, Sergeant Mikel told her that Kraidieh was allowed to use force when arresting someone, and Kraidieh's mistake was only in not arresting anyone. Nudelman recalled Deputy Bates similarly stating that, if Kraidieh perceived Nudelman as a threat, he had every right to use force as he did. With these comments, Nudelman felt as though she was being intimidated and blamed for the incident, and she began crying in response.

In March 2012, Nudelman sued Kraidieh for assault.[2] After discovery, in October 2015, Kraidieh filed a plea to the jurisdiction or, in the alternative, a motion for summary judgment, claiming statutory immunity under section 101.106(f) of the Tort Claims Act. The trial court denied Kraidieh's motion, and this interlocutory appeal followed.[3]

## Discussion

Kraidieh contends that the trial court erred by denying his motion because (1) the record conclusively establishes that he was within the scope of his employment when he attempted to detain Nudelman and (2) the claim asserted against him could have been brought under the Tort Claims Act against his

---

[2] Nudelman subsequently amended her petition to add the owners of the Millennium Apartments, alleging respondeat superior and negligent hiring, supervision, and training. The Millennium defendants counterclaimed, seeking sanctions for filing a frivolous pleading barred by the statute of limitations. Nudelman nonsuited the Millennium defendants.

[3] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (authorizing interlocutory appeal from denial of governmental unit's plea to the jurisdiction); *see also Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007).

governmental employer and, therefore, is subject to dismissal under section 101.106(f).

## A. Standard of Review

We review de novo a trial court's ruling on a plea to the jurisdiction. *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007). "In a suit against a governmental unit, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). The plaintiff must allege facts that affirmatively establish the trial court's subject-matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *City of Pasadena v. Kuhn*, 260 S.W.3d 93, 95 (Tex. App.—Houston [1st Dist.] 2008, no pet.). In determining whether this burden has been satisfied, we must construe the pleadings liberally in the claimant's favor and deny the plea if the claimant has alleged facts affirmatively demonstrating jurisdiction to hear the case. *Tex. Dep't of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Smith v. Galveston Cty.*, 326 S.W.3d 695, 697–98 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

## B. Section 101.106 of the Tort Claims Act

Governmental immunity protects the State and its political subdivisions from lawsuits and liability, which would otherwise "hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments

7

rather than using those resources for their intended purpose." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008) (quoting *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006)). It is a long-settled rule that "no state can be sued in her own courts without her consent, and then only in the matter indicated by that consent." *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847). The Texas Tort Claims Act provides a limited waiver of immunity for certain suits against governmental entities. *See* TEX. CIV. PRAC. & REM. CODE § 101.023. The Act governs all tort claims asserted against a governmental entity and serves as "the only, albeit limited, avenue for common-law recovery against the government." *Garcia*, 253 S.W.3d at 655.

The Act was revised in 2003 to include an election-of-remedies provision. As revised, section 101.106 forces claimants to "decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable, thereby reducing the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery." *Garcia*, 253 S.W.3d at 657. In relevant part, the provision states:

> (a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.

8

(b) The filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents.

. . .

(f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

TEX. CIV. PRAC. & REM. CODE § 101.106. The Supreme Court of Texas has cautioned that, because this election-of-remedies provision imposes "irrevocable consequences, a plaintiff must proceed cautiously before filing suit and carefully consider whether to seek relief from the governmental unit or from the employee individually." *Garcia*, 253 S.W.3d at 657.

## C.    Analysis

In order to be entitled to dismissal under the election-of-remedies provision of the Tort Claims Act, Kraidieh had the burden to conclusively prove: (1) he was a governmental unit employee at the relevant time; (2) the complained-of conduct was within the general scope of his employment with a governmental unit; and (3) Nudelman's suit could have been brought under the Tort Claims Act against

9

Kraidieh's governmental employer. TEX. CIV. PRAC. & REM. CODE § 101.106(f); *Franka v. Velasquez*, 332 S.W.3d 367, 369 (Tex. 2011); *Fink v. Anderson*, 477 S.W.3d 460, 465–66 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The parties do not dispute that the Houston Police Department is a governmental unit and that it was Kraidieh's employer at the relevant time. Thus, only two questions remain: whether Kraidieh conclusively proved that his conduct was within the general scope of his employment and whether Nudelman's suit could have been brought under the Tort Claims Act against his governmental employer, HPD. We address each of these issues in turn.

### 1. General scope of employment

Kraidieh argues that he conclusively established that his conduct was within the general scope of his employment at the time of the alleged assault. Though he was off-duty at the time, Kraidieh argues the record conclusively shows he responded as a police officer to what he believed were cries of distress. He further argues that, upon finding publically intoxicated adults creating a disturbance, it was his duty as an officer to respond. Nudelman contends that Kraidieh failed to conclusively establish that he was acting within the scope of his employment because he was off-duty, and attempting to enforce the rules of the apartment complex because he was personally agitated at being awakened. Nudelman further

relies on the fact that Kraidieh did not arrest anyone or file an official incident report to argue that Kraidieh was not acting as a public officer.

The Act defines the term "scope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to an employee by competent authority." TEX. CIV. PRAC. & REM. CODE § 101.001(5); *see also City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994) ("An official acts within the scope of her authority if she is discharging the duties generally assigned to her."). The Texas Supreme Court has further clarified the term through reference to the Restatement (Third) of Agency, which explains that "[a]n employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." RESTATEMENT (THIRD) OF AGENCY § 7.07(2) (2006), *cited by Alexander v. Walker*, 435 S.W.3d 789, 792 (Tex. 2014). "Thus, when an employee engages in conduct 'for the sole purpose' of furthering someone else's interests and not his employer's, the conduct is outside the employee's scope of employment." *Fink*, 477 S.W.3d at 466.

Under Texas law, "[i]t is the duty of every peace officer to preserve the peace within the officer's jurisdiction." TEX. CODE CRIM. PROC. art. 2.13(a). An officer is not relieved of the duty to preserve the peace merely because he is "off-

11

duty." *Blackwell v. Harris Cty.*, 909 S.W.2d 135, 139 (Tex. App.—Houston [14th Dist.] 1995, writ denied). Thus, whether an officer is technically on-duty or off-duty does not determine whether conduct he undertakes is within the scope of employment. *See Harris Cty. v. Gibbons*, 150 S.W.3d 877, 882 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Instead, the dispositive question is: "in what capacity was the officer acting at the time he committed the acts for which the complaint was made." *Blackwell*, 909 S.W.2d at 139. "If an officer is performing a public duty, such as enforcement of general laws, he is acting 'in the course and scope of his employment as a police officer even if the [private] employer directed him to perform the duty.'" *Gibbons*, 150 S.W.3d at 882 (quoting *Bridges v. Robinson*, 20 S.W.3d 104, 111 (Tex. App.—Houston [14th Dist.] 2000, no pet.), *disapproved of on other grounds*, *Telthorster v. Tennell*, 92 S.W.3d 457, 464 (Tex. 2002)).

Here, the record conclusively shows that upon arriving at the pool area, Kraidieh observed four adults in the hot tub whom he believed, based on their conduct, were publically intoxicated. Kraidieh averred that he believed the four individuals could be a danger to themselves or others. Thus, irrespective of any house-rules which the group may have been violating, Kraidieh observed

violations of public laws.[4] Having made such observations, whether off-duty or on-duty, Kraidieh had a duty to preserve the peace and prevent a possible crime. TEX. CODE CRIM. PROC. arts. 2.13, 6.06. Accordingly, in attempting to detain the group, Kraidieh was performing his public duty and serving the purposes of his employer. Because Kraidieh was "in or about the performance of a task lawfully assigned to an employee by competent authority," he was acting within the "scope of employment" for purposes of the Act. *See* TEX. CIV. PRAC. & REM. CODE § 101.001(5) (defining "scope of employment").

Nudelman maintains that there is a fact issue as to whether Kraidieh was acting in the scope of employment because he was responding as a private resident of the apartment complex or as private security for the apartment complex. In support, Nudelman highlights evidence that (1) Kraidieh may have first approached the group because he was asked to do so by Deputy Bates, (2) Kraidieh did not initially identify himself as an officer and did not have his police

---

[4] Section 49.02 of the Texas Penal Code provides that a person commits the offense of public intoxication if she appears in a public place while intoxicated to the degree that she may endanger herself or another. TEX. PENAL CODE § 49.02. Section 42.01 provides, in relevant part, that a person commits the offense of disorderly conduct if she intentionally or knowingly "makes unreasonable noise in a public place." TEX. PENAL CODE § 42.01(a)(5). A public place includes the common areas of apartment houses. *See* TEX. PENAL CODE ANN. § 1.07(40) (providing that "public place" means "any place to which the public or a substantial group of the public has access and includes, but is not limited to . . . the common areas of . . . apartment houses"); *Holmes v. State*, 795 S.W.2d 815, 817 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd) (defendant arrested for public intoxication in parking area of private apartment complex).

13

identification, duty belt, or handcuffs on his person, (3) Kraidieh did not stay at the scene, instead retreating to his apartment, and (4) Kraidieh neglected to file a police report and did not arrest or cite anyone. We first note that whatever Kraidieh's initial impetus to approach the pool area, the violation of public laws triggered a duty to respond as a peace officer. Thus, whether Kraidieh was awakened and went to the pool area because he himself heard noise from the area or because Deputy Bates called him is irrelevant to the question of whether Kraidieh was acting with the scope of his employment when he attempted to detain, and allegedly assaulted, Nudelman.

Similarly, whether Kraidieh was personally agitated and harboring personal motivation to oust the group from the pool does not change the analysis so long as his conduct served HPD's purpose. This is because "co-existing motivations do not remove an employee's actions from the scope of his employment so long as the conduct also serves a purpose of the employer." *Fink*, 477 S.W.3d at 471 (citations omitted). Accordingly, "[a]n activity may serve the employer's purposes while simultaneously benefiting the employee or even a third party and still qualify as conduct within the scope of employment." *Id*. (finding state university professor's discussions with investors regarding the efficacy of his invention was in scope of his employment even if such discussions also served professor and his son's interests); *see also Arbelaez v. Just Brakes Corp*., 149 S.W.3d 717, 721–22

14

(Tex. App.—Austin 2004, no pet.) (holding that even if employee personally benefitted to some degree by breakfast run done at his manager's request, his actions were still within the course and scope of his employment). Thus, accepting as true Nudelman's contention that Kraidieh was acting for his personal benefit or for the benefit of the apartment complex, we must conclude Kraidieh was acting within the general scope of his employment because his complaint served a purpose of his employer.

We likewise must reject Nudelman's arguments that Kraidieh's conduct was not in the scope of employment as a matter of law because he violated HPD policies during their altercation. Whether an employee is acting within the "scope of employment" depends on whether he was performing the duties of his governmental employer's office, not on how adequately he performed such duties. *See* TEX. CIV. PRAC. & REM. CODE § 101.001(5); *see e.g., Alexander*, 435 S.W.3d at 790 (expressing no opinion as to whether officers acted in good faith in holding that alleged improper conduct of officers during course of arrest fell within general scope of their employment and was subject to election-of-remedies provision of Act). Upon observing a violation, Kraidieh had a duty to enforce general laws. Whatever missteps he took in performing that duty do not remove his conduct from the general scope of his employment.

15

## 2. Claims could have been brought under Tort Claims Act

The Texas Supreme Court has held that a claim is one that "could have been brought" under the Tort Claims Act if it (1) "is in tort" and (2) is not brought "under another statute that independently waives immunity," even if immunity has not been waived for the tort alleged. *Franka*, 332 S.W.3d at 381 (explaining that "any tort claim against the government is brought 'under' the [TTCA] for purposes of Section 101.106(f), even if the Act does not waive immunity"); *Fink*, 477 S.W.3d at 472 (same). Here, Nudelman sued for assault, an intentional tort. Nudelman did not plead, nor does she argue on appeal, that her claim was brought under another statute that independently waives immunity. Thus, for purposes of section 101.106(f), Nudelman's claim is one that could have been brought under the Tort Claims Act. *See Franka*, 332 S.W.3d at 381.

Because the complained-of conduct was within the general scope of Kraidieh's employment and Nudelman's suit could have been brought under the Tort Claims Act, pursuant to section 101.106(f), Nudelman's suit is considered to be against Kraidieh in his official capacity only. *See* TEX. CIV. PRAC. & REM. CODE § 101.106(f); *Franka*, 332 S.W.3d at 370. In this circumstance, section 101.106(f) required the trial court to dismiss Kraidieh unless Nudelman filed an amended pleading dismissing Kraidieh and naming the governmental unit as defendant on or before the 30th day after Kraidieh filed his plea to the jurisdiction.

16

TEX. CIV. PRAC. & REM. CODE § 101.106(f). Nudelman did not file amended pleadings, and thus the trial court erred as a matter of law in failing to grant Kraidieh's plea and dismiss the suit.

## Conclusion

We reverse the trial court's order and render judgment granting Kraidieh's plea to the jurisdiction and dismissing the case.

Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Higley and Huddle.