

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-19-00256-CV

SAM ANDREWS, M.D., APPELLANT

V.

REBECCA VILLARREAL ORTIZ, APPELLEE

On Appeal from the 72nd District Court of
Lubbock County, Texas
Trial Court No. 2019-534,421, Honorable Ruben G. Reyes, Presiding

September 1, 2020

## MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and DOSS, JJ.

This appeal deals with a medical examiner purportedly harvesting, on a regular basis, the brain, eyes, spine, lungs, and heart from dead children to assist a colleague's independent research project. The medical examiner was Sam Andrews, M.D., and he conducted or allowed the autopsies to be conducted while allegedly acting as the Chief Medical Examiner for Lubbock County. His colleague, Evan Matshes, M.D., was a managing officer of a pathology laboratory with which Andrews also worked. Apparently with the permission of the Lubbock County Medical Examiner, Matshes too would perform

autopsies on children. During one such occasion he allegedly told others in the room "[t]his is nothing" and "[a] couple days ago, I did a case where you could have rolled the baby up and put it in a cup."

Andrews now complains before us that the trial court erred in denying his motion to dismiss the suit brought against him by one child's grandmother and caretaker, Rebecca Villarreal Ortiz. He believed she sued him in his official capacity which triggered the application of § 101.106(f) of the Texas Civil Practice and Remedies Code. The statute provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f) (West 2019). Andrews moved to dismiss the cause since Lubbock County was not sued in his place. We affirm.

*Background*

The dispute arose from Andrews directing Stephen Pustilnik, M.D. to conduct an autopsy upon the corpse of Ortiz's 10-year-old granddaughter. At the time, and according to his affidavit, Andrews allegedly served as the interim Chief Medical Examiner for Lubbock County. So too was he an employee of National Autopsy Assay Group LLC, which entity "sub-contracted" him to NAAG Pathology Labs, PC. Apparently, Matshes was the managing officer of NAAG. Andrews further attested that the duties he performed

2

"relative to the Lubbock County Medical Examiner's office ha[d] been in connection with [his] employment duties with NAAG."[1]  Before issuing his directive to Pustilnik, Andrews spoke with Matshes about the forthcoming autopsy.  Thereafter, Pustilnik was ordered to remove from the child's corpse her eyes, brain, entire spine, heart, lungs, and other body parts.  He complied, and the parts were sent to NAAG in San Diego.  There, they remained.

According to Pustilnik, removal of more than the child's brain was unnecessary to determine the cause of death or identity of the child.  He opined, from talking with Matshes, that the additional organs were sought to further independent research interests of Matshes, and they were acquired and retained without consent from any family member.  Such was unethical, unreasonable, and "illegal" given applicable rules of forensic pathology, the circumstances of the child's death, and article 49.25 of the Texas Code of Criminal Procedure.  Ultimately, Ortiz sued Andrews, Matshes, NAAG, and National Autopsy.  Her causes of action included accusations about the defendants 1) "mishandling of remains," 2) interfering "with [her] right to possession [of her grand-daughter's remains] for final disposition," 3) committing "civil theft and conversion," and 4) engaging in a "civil conspiracy."

*Disposition*

Andrew's motion to dismiss raised the issue of immunity.  Such affects the trial court's subject-matter jurisdiction.  *Fink v. Anderson*, 477 S.W.3d 460, 465 (Tex. App.—Houston [1st Dist.] 2015, no pet.).  And, whether it divests the trial court of jurisdiction to

---

[1] NAAG executed a contract with Lubbock County to provide "comprehensive ("full spectrum") death investigating services, in accordance with all applicable federal, state, and local laws, rules, and regulations, as well as any applicable County policies."  An Evan Matshes, MD, executed the agreement on behalf of NAAG.

entertain the cause is a question of law which we review de novo. *Id.*; *Tex. Tech. Univ. v. Dolcefino Communs., LLC*, 565 S.W.3d 442, 444–45 (Tex. App.—Amarillo 2018, no pet.). In conducting that review, we consider the plaintiff's pleadings and evidence relevant to the jurisdictional inquiry; we do not adjudicate the merits of the underlying claims, though. *Fink*, 477 S.W.3d at 465. Yet, that does not mean the merits are irrelevant, for they may indeed become implicated. When they are and when the parties tendered evidence touching upon them, the standard of review utilized in addressing the jurisdictional dispute mirrors that applicable to reviewing a traditional motion for summary judgment. *Tex. Tech. Univ., LLC*, 565 S.W.3d at 445. Thus, we may not dismiss the cause if there exists a material issue of fact pertinent to the merits, and therefore, the jurisdictional question. *Id.* Instead, that issue must be resolved by the fact-finder. *Id.* And, because the standard of review mirrors that of a summary judgment, we accept as true all evidence favorable to the nonmovant, indulge in every reasonably inference from that evidence in favor of the nonmovant, and read the evidence in a light most favorable to the nonmovant. *Id.*

Again, § 101.106(f) requires the dismissal of a lawsuit against a governmental employee sued in his official capacity but affords the plaintiff opportunity to substitute the governmental unit itself for the employee. *Garza v. Harrison*, 574 S.W.3d 389, 393 (Tex. 2019). Moreover, the suit is deemed one against him the defendant in his official capacity if the elements of § 101.106(f) are met. TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f); *Garza*, 574 S.W.3d at 394. So, here, it does not matter that Ortiz expressly alleged she was suing Andrews in his individual capacity. If the terms of § 101.106(f) are met, we

4

must consider the action as one against him in his official capacity as Chief Medical Examiner for Lubbock County.

The crux of the debate at bar concerns Andrew's status as a Lubbock County employee, the scope of his employment, and whether the removal and retention of the aforementioned organs fell within that scope. As for the first component (i.e., his status as an employee), we note the legislature's definition of "employee" provided in chapter 101 of the Civil Practice and Remedies Code. That body defined it as meaning "a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control." TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2).

As for the second component (i.e., scope of employment), the legislature also provided us with a definition. We were told it means "the performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to the employee by competent authority." *Id.* § 101.001(5); *Garza*, 574 S.W.3d at 400. That leaves the third component, i.e., whether the purported misconduct underlying the suit fell within the employee's scope of employment. When assessing it, we note that the "critical inquiry is whether, when viewed objectively, 'a connection [exists] between the employee's job duties and the alleged tortious conduct.'" *Id.* at 401 (quoting *Laverie v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017)). In other words, an employee's conduct falls within the scope of his employment if he was doing his generally assigned duties or job at the time of the alleged tort. *Id.*

5

And, because the viewpoint must be objective, as opposed to subjective, the employee's personal state of mind, motives, and competency when performing the tasks giving rise to suit are irrelevant. *Id.* It is enough if his conduct, in and of itself, was pursuant to the employee's job responsibilities, *id.*, or, if it "serve[d] any purpose of the employer . . . even if it escalates beyond [the duties] assigned or permitted." *See Fink*, 477 S.W.3d at 466; *see also Lopez v. Serna*, 414 S.W.3d 890, 894 (Tex. App.—San Antonio 2013, no pet.) (holding that the alleged theft by a TDC employee in confiscating property of the prisoner was within the scope of employment since his duties included the confiscation of property). Similarly irrelevant is whether the conduct served multiple purposes, so long as one was for the employer. *Fink*, 477 S.W.3d at 471 (stating that "co-existing motivations do not remove an employee's actions from the scope of employment so long as the conduct also serves a purpose of the employer"). With this said, we turn to the record at bar, begin our journey with the second and third components, and assume *arguendo* that Andrew's situation met the definition of "employee" for Lubbock County.

As the medical examiner, Andrews had "essential duties," according to Lubbock County. They included, among other things, 1) "conduct[ing] post-mortem examinations to determine cause and manner of death," 2) "[i]nvestigat[ing] deaths in accordance with Article 49.25, Texas Code of Criminal Procedure," 3) "[o]rder[ing] appropriate analytical testing," and 4) "[c]ollect[ing] specimens and evidentiary materials." As for article 49.25, it also authorized the medical examiner to investigate the deaths of those people who, among other things, 1) die within 24 hours after admission to a hospital, TEX. CODE CRIM. PROC. ANN. art. 49.25, § 6(a)(1) (West 2018); 2) are killed, *id.* § 6(a)(2); 3) die an unnatural death, *id.*; 4) die outside the presence of a witness, *id.*, and 5) die and the circumstances

of the death lead to suspicion that death was by unlawful means. *Id.* § 6(a)(4). Neither the "essential duties" nor the statute prescribe the manner in which an autopsy must be performed. Nor do either expressly allow examiners to undertake any measure of evisceration or dissection of the corpse which they may arbitrarily select. Obviously, they do have discretion in that regard. Yet, we do find within the statute reference to determining "the cause of death." For instance, it provides that "[i]n those cases where a complete autopsy is deemed unnecessary by the medical examiner **to ascertain the cause of death**, the medical examiner may perform a limited autopsy involving the taking of blood samples or any other samples of body fluids, tissues or organs, in order **to ascertain the cause of death** or whether a crime has been committed." *Id.* art. 49.25, § 9(a) (emphasis added). In framing the performance of both a complete and partial autopsy by reference to "ascertain[ing] the cause of death," it would be logical to conclude that autopsies are primarily conducted to serve that purpose. *See Keith v. State*, No. 09-16-00166-CR, 2017 Tex. App. LEXIS 11298, at *9 (Tex. App.—Beaumont Dec. 6, 2017, pet. ref'd) (mem. op.) (noting the pathologists testimony that "the purpose of an autopsy is to determine the cause and manner of death").[2] Similarly logical from this is that the primary duty of a medical examiner when performing autopsies is to determine causes of death.

The evidence before us indicates that Ortiz's granddaughter died within 24 hours of being admitted to a hospital. Consequently, Andrews had the authority to conduct a post-mortem examination, or autopsy, upon her corpse. He also had the authority to

---

[2] Here, Dr. Pustlinik attested that "[a]n autopsy is statutorily authorized in certain circumstances, such as suspected homicide, to determine identity of the decedent, the cause and manner of death, and mechanism of death."

collect specimens from the body, per the "essential duties" Lubbock County ascribed to the position of medical examiner.

In actuality, no one questions Andrew's authority to order an autopsy and collect specimens. Rather, the dispute concerns 1) the extent of the specimens he told Pustlinik to harvest, 2) their eventual retention by the entity subcontracting Andrew's services, that is, NAAG, and 3) whether both fell within the scope of his employment with the County. According to Ortiz, he ordered the harvest of more organs than necessary or reasonable and did so for a purpose unrelated to his employment by Lubbock County. Again, the purpose, she believes, was not to determine the cause of her granddaughter's death but rather to assist the independent research efforts of Matshes.

Andrews disagreed with that notion. Appearing of record is evidence purporting to explain why he ordered the autopsy and removal of the organs in question. That evidence consists of his attesting that 1) the child was in Ortiz's care prior to death; 2) upon the child's death, a representative of the medical examiner's office spoke with Ortiz, 3) Ortiz informed the representative that her granddaughter had been "shaken at an early age, possibly around or before the age of one and was diagnosed with a skull fracture at that time . . . 'the incident was not proven,' but that the [child] was blind, had scoliosis with the possibility that it was because of the [2008] incident"; 4) "[i]n my role as Lubbock County Medical Examiner, I determined that under the circumstances, an autopsy was necessary"; 5) he and Matshes spoke before ordering the autopsy; and 6) "a support plan was devised that included me providing Dr. Pustilnik with written directions and suggestions for autopsy performance." In those written directions, he described the case as "high profile" and one of "possible delayed abusive head trauma death." Given the

8

possibility of an "abusive head trauma death," he then told Pustlinik to remove and preserve the child's lungs, heart, entire spine, eyes, "skull fractures," and "dura mater and brain" for processing by NAAG. Later he would proffer an additional justification for the rather invasive autopsy. It consisted of explaining that: "[t]he competent and modern performance of a forensic autopsy (including especially a criminally suspicious pediatric death) involves the careful dissection of the human body, the removal and detailed evaluation of all internal organs, extensive photo-documentation, and broad histologic sampling so as to resolve a broad differential diagnosis that extends (and may overlap) between natural diseases and inflicted injuries."

However, his justifications of eviscerating the body of Ortiz's grandchild were not uncontradicted. Evidence contradicting them included Pustlinik attesting that: 1) there was "no mystery to the cause and manner of [the child's death] death as well as the mechanism of death which had been clinically well documented"; 2) she had "presented with upper respiratory infection and sepsis and died at University Medical Center"; 3) "[i]t was also well known that the neurologic impairment she had was due to the blunt head trauma that was inflicted on her *nine years prior*"; 4) "Matshes expressed in a conversation that day with me his desire to obtain these tissues from [the child] for the purpose of research [since] this was a rare case of a delayed death due to inflicted blunt head trauma"; 5) "Matshes told me about his academic research motivation"; 6) "this was consistent with the previous pediatric cases that he wanted excessive tissue retained from[,] including non-inflicted traumatic cases as well as natural disease causes of death"; 7) "he wanted those non-traumatic cases to serve as his negative controls for propounding his theory of the physical and pathologic findings at postmortem

9

examination"; 8) the removal of the organs and their delivery to NAAG in San Diego was "entirely in keeping with their [Andrews's and Matshes's] normal practice of retaining excessive tissue for . . . Matshes['] stated prospective research objectives and collecting negative control tissues along with tissues from children with inflicted head injuries"; 9) "[t]he brain, dura mater, eyes, and cervical spinal cord as well as any bony injury would be what a prudent forensic pathologist would retain on a suspected inflicted head trauma case on a child who **died within hours or days of the injury**"; 10) Ortiz's granddaughter "**died nine years after** the fact, and those tissues were reasonably expected to show only non-specific, long-term healing changes"; 11) "[n]o pathologic finding in any of the retained tissues would determine or alter the known cause and manner of [her] death"; 12) "[t]he mechanism of death was a respiratory illness and sepsis which are the expected consequences of people suffering the profound neurologic deficits that [the child] suffered"; 13) a "reasonably prudent forensic pathologist would not have ordered the retention of the entire cervical spinal column, the entire spinal cord, the heart"; 14) it "was not forensically required or appropriate"; and 15) '[i]t [was] completely outside the normal practice of forensic pathology and outside the duties of the Lubbock County Medical Examiner Office.[3] (Emphasis added). As can be seen, Pustlinik did not necessarily decry the decision to conduct an autopsy, but he certainly disputed the need for its extensiveness. And, it cannot be denied that one could reasonably interpret his comments as illustrating that he viewed the true reason for its extensiveness as relating to Matshes's independent research interests.

---

[3] Apparently, Pustlinik served as a senior pathologist for the Lubbock County Medical Examiner.

10

Of record is other evidence that tends to confirm Pustlinik's views regarding why the organs of Ortiz's grandchild were actually removed and shipped to San Diego. For instance, an investigator of the Lubbock County Medical Examiner spoke of another autopsy conducted in September 2018 by Andrews and attended by Matshes. The corpse was that of a one-month-old female. And, upon "seeing evidence that her death was most likely a natural death, Dr. Matshes stated, 'We need more naturals like this for research.'" Thereafter, "Andrews harvested [the] brain, eyes, spinal cord, posterior neck, heart, [and] lungs" from the infant and had the "tissue . . . shipped to NAAG's facility or office in San Diego, California."

Additionally, an autopsy technician with the Lubbock medical examiner's office related that "[f]or every child under the age of ten, NAAG's practice was to take the eyes, brain, heart, lungs, and spinal cord, in every case-natural, homicide, accident, and other" case. So too did he describe various autopsies on young children conducted during Andrews's tenure as the Lubbock medical examiner. One performed in August of 2018 was upon a three to four-year-old child who died as a result of an accident. "There was no question as to the cause of death; it was an accident (no suspicion of homicide)," he said. And, the "normal practice following such a death would be to perform a full autopsy, but no tissue would be retained." Instead, "Matshes directed the autopsy and he and Dr. Andrews collected this child's brain, eyes, heart, lungs, spinal cord, and the entire cervical vertebrae." During a different autopsy performed a month later on a child who died "a natural death," the "normal practice in such a case would be to 'terminate jurisdiction.'" Instead, Matshes stated that "'[t]his autopsy needed to be done [and] [t]he specimens and

11

organs that we're collecting on this case will be used for research . . . related to shaken baby syndrome." Then, the "child's brain, eyes, heart, lungs, spinal cord, and the entire cervical vertebrae" were harvested.

Whether one acted within the scope of his employment generally is a question of fact. *Mayes v. Goodyear Tire & Rubber Co.*, 144 S.W.3d 50, 56 (Tex. App.—Houston [1st Dist.] 2004), *rev'd on other grounds*, 236 S.W.3d 754 (Tex. 2007); *accord Kulms v. Jenkins*, 557 S.W.2d 149, 153 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.) (stating that because there was some evidence of probative force that Kulms was in the scope of his employment at the time of the collision, the issue was for the jury). In resolving that question of fact one need not conclude that "once acting within the scope of employment then always acting in that scope." Actions may depart from the road of one's employment purposes. Authority relied upon by the Supreme Court in *Garza* illustrate as much. "Matters of degree are . . . relevant to" the determination of whether tortious conduct lies within the scope of employment. Restatement (Third) of Agency, § 7.07, cmt. c (2006). Furthermore, the extreme quality of one's actions "may indicate that [the person] has launched upon an independent course of action," outside the scope of employment. *Id.* "In determining whether an employee's tortious conduct is within the scope of employment, the nature of the tort is relevant, as is whether the conduct also constitutes a criminal act." *Id.* "An employee's intentionally criminal conduct may indicate a departure from conduct within the scope of employment, not a simple escalation" and the "nature and magnitude of the conduct are relevant to determining the employee's intention at the time." *Id.*

Interpreting the foregoing evidence and reasonable inferences therefrom in a light most favorable to Ortiz creates an issue of fact concerning the purpose underlying Andrews's decision to harvest so many of the child's organs. In short, Andrews says he did what he did in furtherance of his role as a medical examiner charged to investigate criminal activity and causes of death related to criminal activity. Nevertheless, a reasonable fact-finder could deem that false. Pustlinik and others working in the same office provided evidence of an alternative purpose underlying Andrews's directive to remove the eyes, lungs, heart, brain and spine of Ortiz's ten-year-old granddaughter. The purpose of which we speak is Matshes's independent desire to conduct academic research and collect body parts from dead children to further his own goals. More importantly, Andrews did not cite us to evidence suggesting that the "essential duties" of the Chief Examiner of the Lubbock County Medical Examiner's office included harvesting body parts from dead people (or children] to further the personal research interests of third parties. Nor did our reading of article. 49.25 of the Code of Criminal Procedure reveal any indication that such was a permissible duty of a medical examiner charged with "ascertaining the cause of death" in a particular case. The absence of such an indication in the statute is also telling since violating the provision is a criminal offense. *See* TEX. CODE CRIM. PROC. ANN. art. 49.25, § 14(a), (b) (stating that a person commits a class B misdemeanor by knowingly violating the article).

Simply put, there exists an issue of fact concerning whether Andrews acted within the scope of his alleged employment with Lubbock County. So long as that issue exists, we cannot say that Andrews satisfied the prerequisites of § 101.106(f). It also provided the trial court at least one ground upon which it could have legitimately denied his motion

13

to dismiss. Another also appears of record, however. It concerns the nature of relief sought by Ortiz.

Contrary to Andrews suggestion, Ortiz pursued not only "monetary damages. . . but also an order . . . to deliver [the decedent's] brain and dura [mater], neck, spinal cord, eyes, heart, and lungs to Kevin Combest of Combest Funeral Home, a licensed funeral director and crematory, for final disposition." Compelling the return of property illegally taken is comparable to seeking prospective relief. *State v. Reimer*, 571 S.W.3d 441, 448 (Tex. App.—Amarillo 2019, no pet.) (stating that an action to recover possession of property unlawfully claimed by a state official is essentially a suit to compel a state official to act within the officer's statutory or constitutional authority, and the remedy of compelling return of the illegally held property "is prospective in nature"). It can be pursued against the official through a suit wherein the complainant alleges that the official acted ultra vires. *See id*. at 445 (describing an ultra vires suit as one to require the official to comply with statutory or constitutional provisions). Moreover, Ortiz alleged here that Andrews engaged in unlawful conduct when taking and retaining the body parts of her grandchild, and Andrews made no attempt on appeal to rebut her ultra vires allegation other than to say damages may not be awarded under it. However, she wants more than damages; she also wants the chance to place the entirety of her granddaughter at rest through the return of the child's body parts.

We overrule Andrews's issue and affirm the trial court's order denying his motion to dismiss under § 101.106(f) of the Texas Civil Practice and Remedies Code.

Brian Quinn
Chief Justice

14