Opinion issued November 4, 2025



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00730-CV

———————————

**PADMANEE SHARMA, Appellant**

**V.**

**JAMIE LIN, Appellee**

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-54896**

## MEMORANDUM OPINION

This case arises out of a dispute between two physician scientists employed by the University of Texas MD Anderson Cancer Center ("MD Anderson") over authorship credit for manuscripts prepared for publication in scholarly journals. Appellee Dr. Jamie Lin sued her colleague and former mentor, Appellant Dr.

Padmanee Sharma, for various intentional torts and a declaratory judgment about the authorship of one of the articles at issue.

Dr. Sharma moved for dismissal under the Texas Tort Claims Act's "election-of-remedies" provision, arguing her allegedly tortious conduct was done in her official capacity and, thus, MD Anderson was the only proper party to the suit. *See* TEX. CIV. PRAC. & REM. CODE § 101.106(f). The trial court denied her motion, and Dr. Sharma appealed. We conclude the trial court erred in denying Dr. Sharma's motion to dismiss. Accordingly, we reverse the trial court's order and render judgment dismissing Dr. Lin's claims with prejudice.

**Background**

**A.     Drs. Sharma and Lin and their work at MD Anderson**

Dr. Sharma and Dr. Lin are both employed by MD Anderson. MD Anderson is a comprehensive cancer center and "one of the preeminent cancer research facilities in the nation." The research performed by MD Anderson's faculty and staff furthers its mission of "eliminat[ing] cancer in Texas, the nation, and the world through outstanding programs that integrate patient care, research[,] and prevention[.]"

Dr. Sharma, who began working for MD Anderson in 2004, is a senior member of MD Anderson's faculty; Dr. Lin is a more junior member. In her pleadings in the trial court, Dr. Lin describes Dr. Sharma as "a very well-established,

2

recognized scientist and doctor on the senior faculty and in key leadership positions at MD Anderson." Dr. Sharma's primary appointment is as a full professor in the Department of Genitourinary Medical Oncology of MD Anderson's Division of Cancer Medicine, and she also has appointments as a full professor in its Department of Immunology, as vice president of immunobiology in its Department of Immunology, and as the director of scientific programs at its James P. Allison Institute.

Dr. Lin began working for MD Anderson in 2017. In her pleadings below, Dr. Lin describes herself as "a young, rising and promising scientist and doctor on the junior faculty of [MD Anderson] aspiring to become a reputable figure within the medical community." Her position at MD Anderson is an assistant professor of the science of nephrology in MD Anderson's Division of Internal Medicine. Dr. Lin "aspires to continue to advance her career at MD Anderson."

Drs. Sharma and Lin are both engaged in medical research at MD Anderson. As a senior researcher, Dr. Sharma's work includes not only conducting research but also supervising and guiding clinical trials and research performed by MD Anderson's other faculty and staff.

The publication of such research in academic journals is important not only for the advancement of medical science, but also for the advancement of the

researchers' careers. And because scientific research is often a collaborative effort, multiple researchers can receive authorship credit when the research is published.

But not all authorship credit is equal. The sequence and categorization of the authors' names in a published research article can reflect each author's respective contribution and thus affect the level of prestige for each author accordingly. For example, according to Dr. Lin's pleadings, "First Author" credit generally goes to the person who contributes most to the work (and this position is often sought after because it is the only name used in some citation formats, such as "Smith et al."). The "Senior Author" is the person who took leadership for the project. A "Corresponding Author" is someone who takes primary responsibility for communicating with the journal during the manuscript submission, peer review, and publication processes. MD Anderson has promulgated formal policies to help identify these roles and require proper attribution for each type of authorship.

## B. The CIR Manuscript

This case arose out of a dispute between Drs. Sharma and Lin over authorship credit. Dr. Lin first joined MD Anderson in 2017, and Dr. Sharma began acting as her mentor on an informal basis. By 2020, Dr. Lin had developed an interest in immunology, and Dr. Lin became her professional mentor.

Around that time, Dr. Lin and at least two other doctors at MD Anderson, Drs. Ala Abudayyeh and Adi Diab, began working on research relating to the presence

4

of "tertiary lymphoid structures" in certain cancer treatments ("TLS Research"). According to Dr. Sharma, the TLS Research project was "a relatively small one, involving the kidney biopsy samples and genetic materials of only a few clinical patient samples," but "a good way for a doctor new to clinical research, such as Dr. Lin, to skill-build and gain experience." The parties apparently do not dispute that Dr. Sharma was also involved in the project. Dr. Sharma describes her involvement as working with raw data to "deconvolute the information according to known immunologic markers" and participating in multiple meetings with Dr. Lin and others to discuss various aspects of the research.

The TLS Research continued through the summer of 2021. By August 2021, Dr. Lin was finalizing a manuscript about the TLS Research, which she intended to submit for publication to the journal *Cancer Immunology Research* ("CIR Manuscript"). Dr. Lin also began preparing an invention disclosure report ("IDR") for the TLS Research, which would require her to name its inventors.[1]

The parties disagree about who came up with the idea for the TLS Research. Dr. Sharma claims she had substantial prior experience in this area, including two published articles and a patent, and that she was the one who initially proposed the idea for the TLS Research. According to Dr. Lin, it was her husband—Dr. Cassian

---

[1] Generally, an IDR is a document submitted to MD Anderson when intellectual property is created by MD Anderson researchers.

Yee, also on the faculty at MD Anderson—who "brainstormed and conceptualized" the idea.

On September 27, 2021, Dr. Lin emailed Dr. Abudayyeh, one of the other doctors who worked on the TLS Research, to ask whether he wanted to be listed as an inventor on the IDR. Dr. Lin suggested one-third of the inventorship credit should be given to herself, one-third to Dr. Yee, and one-third to Dr. Abudayyeh; she did not mention Dr. Sharma.

Later that day, Dr. Sharma emailed Drs. Lin and Yee that because she had developed the idea for the TLS Research, she "expect[s] appropriate contribution in the CIR [Manuscript]." Dr. Sharma also wrote that she "expect[s] that you will include me as a co-inventor [on the IDR] based on my contribution."

Dr. Lin alleges Dr. Sharma threatened to withdraw her support for the research if she did not get attribution credit for the TLS Research. Fearing her research career would be jeopardized without Dr. Sharma's support, Dr. Lin ultimately acquiesced to Dr. Sharma's demands. Dr. Yee wrote back to Dr. Sharma, "We will include you on the contribution per paper as you suggest and inventorship. Let us know how we should divide the attribution when filling in the IDR." Dr. Sharma responded that "based on [her] understanding of the IDR," she would suggest Drs. Lin and Abudayyeh each receive twenty-five percent of the inventorship credit, Dr. Yee receive twenty percent, and Dr. Sharma and Dr. Diab each receive fifteen percent.

On November 8, 2021, Dr. Sharma emailed the Senior Associate Editor of *Cancer Immunology Research* about the CIR Manuscript "to be sure that my attribution is accurate." Dr. Sharma identified herself as "co-senior and co-corresponding author" of the CIR Manuscript, Dr. Lin as "co-corresponding author," and Dr. Abudayyeh as "co-senior author." Dr. Sharma told the editor she needed to correct her attribution on the CIR Manuscript because "[i]n addition to my attribution of supervision, writing, and editing, I need to also include: review of data and concept of tertiary lymphoid structures involved in immune-related adverse events." Dr. Sharma sent the email from her MD Anderson email account.

The following day, Dr. Abudayyeh responded to Dr. Lin's email (over a month after she sent it) asking about inventorship credit on the IDR. Copying Dr. Sharma, Dr. Abudayyeh wrote that she would like to be listed as an inventor on the IDR "provided [Drs. Diab and Sharma] are included since they have been instrumental in this project" and Dr. Sharma "came up with looking into the TLS gene signature in my patients [sic] kidney tissue which now is the reason we have an IDR discussion." Dr. Lin emailed back, "To be clear, [Dr. Sharma] did not come up with looking into the TLS gene signature, but in the spirit of collegiality we have included her attribution in the manuscript. Any further discussion regarding the IDR should include [Dr. Yee] who conceived the idea of investigating the TLS gene signature prior to [Dr. Sharma] joining the project." Dr. Sharma responded that Dr.

7

Lin's email was a "blatant lie" and that if she "continue[d] this lie, Jim and I will need to remove our names from the manuscript and let the editor know about your dishonesty."

The next day, Dr. Sharma again emailed the Senior Associate Editor of *Cancer Immunology Research*, using her MD Anderson email, to request a "pause" of the journal's review of the CIR Manuscript. According to Dr. Sharma, "within the past 24 hours, the 3 co-senior authors for this manuscript (Dr. Adi Diab, Dr. Ala Abudayyeh, and myself) were informed that there will be ongoing reviews internally at MD Anderson related to the work in this manuscript and the appropriate credit for authors." Dr. Lin alleges this statement was false. Dr. Sharma asked the journal to suspend its review of the CIR Manuscript "until we have a resolution of the issues being raised." The journal complied with that request and put the manuscript on hold. Apparently, the CIR Manuscript has never been published.

Throughout the remainder of 2021 and into January 2022, MD Anderson attempted to facilitate a resolution of the authorship dispute over the CIR Manuscript. These efforts culminated in a mediation in January 2022, which was unsuccessful.

## C. The JCII Manuscript

When the parties were unable to resolve their dispute over the CIR Manuscript, Drs. Lin and Yee began working on other projects. Over the next year,

8

they conducted research, along with other doctors at MD Anderson, on what Dr. Lin describes in her brief as "the relationship between TLS signatures and a cancer immunotherapy causing swelling in the kidneys' filters." According to Dr. Lin, "Dr. Yee conceptualized the project and [she] oversaw and contributed to all aspects of the project."

In September 2022, Dr. Lin submitted a manuscript of this research to the journal *JCI Insight* ("JCII Manuscript"). After revisions, *JCI Insight* accepted the JCI Manuscript for publication, and it was publicly available on the *JCI Insight* website by December 2022. The JCII Manuscript named Drs. Lin and Yee as co-corresponding authors and the other MD Anderson doctors who had worked on the project as co-authors, none of whom was Dr. Sharma, Dr. Diab, or Dr. Abudayyeh. Drs. Sharma, Diab, and Abudayyeh were not given authorship credit for the JCII Manuscript.

Dr. Sharma reviewed the JCII Manuscript when it became available online. She believed it involved the same or similar research on the TLS signature as the unpublished CIR Manuscript. Dr. Sharma emailed the editor of *JCI Insight*, from her MD Anderson email account, writing that "this work was originally submitted to Cancer Immunology Research and author list consisted of multiple individuals who are currently not on the JCII [Manuscript]." She continued:

> I (along with my team) provided the expertise needed to evaluate the samples for tertiary lymphoid structures (which is the novelty of the

9

manuscript).  Dr. Lin and Dr. Yee refused to acknowledge the contributions that were made by me and other team members.  Initially, Dr. Lin tried to argue that she did all of the work for the project, but email communications were reviewed, and her claims were not accurate. . . .  In addition, we were notified that Dr. Lin presented the data at a national scientific meeting without notifying the other co-authors.  This . . . was viewed as a breach in scientific collaboration. . . .  [I]t seems that Dr. Lin took all of our work on this project and, along with her husband, Dr. Yee, accumulated additional nephritis samples that they analyzed for TLS (based on our original work).  They published the work in JCI Insight without including us as co-authors.  This constitutes an ethical issue and I hope that you will review this issue appropriately.

**D.      MD Anderson's investigation of the authorship dispute**

In December 2022, MD Anderson's senior vice president and chief scientific officer, Dr. Giulo F. Draetta, along with MD Anderson's chief academic officer, Dr. Carin Hagberg, informed Drs. Lin, Sharma, and Yee that MD Anderson had retained an outside law firm and doctor to investigate the authorship dispute and "recommend . . . an informed, ethical, and equitable resolution."  They did so "[b]ased on the considerable institutional resources invested in the research made the basis of the [JCII Manuscript]."  Drs. Draetta and Hagberg told Drs. Lin, Sharma, and Yee that "[i]f adopted by the two of us, [the recommendations of the outside doctor and law firm] will be the institution's final position on the matter."

Drs. Draetta and Hagberg reported the results of the investigation in March 2023.  The outside law firm and doctor recommended: (1) "the [JCII Manuscript] is a clear outgrowth of the original work done for the [CIR Manuscript]"; (2) "[t]he

TLS finding cannot reliably be attributed to Dr. Cassian Yee, and the preponderance of the evidence supports attributing the TLS finding to Dr. Sharma"; and (3) the "author list" should place Dr. Shaibala Singh as "first author" and "corresponding author," with Drs. Lin, Abudayyeh and Sharma sharing "co-senior authorship," and Drs. Yee and Diab as "middle authors."

Drs. Draetta and Hagberg decided to "fully adopt" these recommendations. Dr. Lin objected through a letter to MD Anderson from her counsel and then filed this suit against Dr. Sharma.

## E.    Relevant proceedings in the trial court

In her original and amended pleadings, Dr. Lin asserted claims for defamation, slander, libel, conversion, and theft, and for a declaratory judgment that "she is named and provided the authorship attribution of senior, co-corresponding author on the JCII Manuscript" and that "Dr. Sharma was not an author." Dr. Lin's claims for defamation, libel, and slander are based in part on statements Dr. Sharma made in her emails to the editors of *Cancer Immunology Research* and *JCI Insight*, as well as to "colleagues [and] collaborators," about the authorship dispute. Dr. Lin does not identify any specific statements that Dr. Sharma made to colleagues and collaborators as forming the basis for her claims.

Dr. Sharma filed a motion to dismiss based on the election-of-remedies provision of the Texas Tort Claims Act ("TTCA"). *See* TEX. CIV. PRAC. & REM.

11

CODE § 101.106(f). She argued that her allegedly defamatory statements were all made within the course and scope of her work as a senior researcher for MD Anderson, that Dr. Lin's claims could have been brought against MD Anderson under the TTCA, and that the trial court lacked subject-matter jurisdiction over Dr. Lin's declaratory-judgment claims.

Dr. Lin filed a response, arguing Dr. Sharma's reliance on the TTCA's election-of-remedies provision is misplaced. She contended the TTCA is inapplicable to this case because her claims are for intentional torts and, by its terms, the TTCA excludes intentional torts. *See id.* § 101.057(2). Dr. Lin argued Dr. Sharma is not immune to her claims because Dr. Sharma committed the allegedly tortious acts while acting outside the scope of her employment. And Dr. Lin also argued that any construction of the election-of-remedies provision allowing for the dismissal of her claims would violate the Open Courts provision of the Texas Constitution because it would leave her without a forum in which to seek redress. *See* TEX. CONST. art. I, §13.

The trial court held a hearing on Dr. Sharma's motion in May 2024. At the hearing, counsel for Dr. Lin agreed her claims for conversion and theft fall within the scope of Dr. Sharma's employment and stated, "We actually intend to amend our issue and nonsuit those claims." The trial court later denied Dr. Sharma's motion, and this appeal followed.

**Analysis**

Dr. Sharma raises a single issue on appeal: whether the trial court erred by denying her motion to dismiss under the TTCA's election-of-remedies provision.

**A.    Standard of review**

A governmental employee's motion to dismiss under section 101.106(f) is an assertion of immunity and thus a challenge to the trial court's subject-matter jurisdiction. *Elias v. Griffith*, No. 01-17-003330CV, 2018 WL 3233587, at *5 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.). "When a jurisdictional plea 'challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties.'" *Id.* (quoting *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004)). "The standard of review for a jurisdictional plea based on evidence 'generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c).'" *Id.* (quoting *Miranda*, 133 S.W.3d at 228).

Likewise, our determination involves statutory construction, which is also reviewed under a de novo standard. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017) (per curiam).

**B.    The TTCA and its election-of-remedies provision**

The parties do not dispute that MD Anderson is a unit of state government and as such generally has sovereign immunity. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. Eltonsy*, 451 S.W.3d 478, 481 (Tex. App.—Houston [14th Dist.] 2014, no

pet.) ("The University of Texas MD Anderson Cancer Center is a governmental unit generally entitled to sovereign immunity."). The doctrine of sovereign immunity implicates a court's subject-matter jurisdiction. *Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1*, 669 S.W.3d 178, 182 (Tex. 2023). If a governmental defendant is immune from suit, the trial court lacks subject-matter jurisdiction over a suit for damages against it. *Univ. of Tex. MD Anderson Cancer Ctr. v. Contreras*, 576 S.W.3d 439, 442–43 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

The TTCA provides a limited waiver of immunity for certain tort claims. *Laverie v. Wetherbe*, 517 S.W.3d 748, 752 (Tex. 2017); *see also* TEX. CIV. PRAC. & REM. CODE § 101.025. Where the waiver applies, a unit of government can be held vicariously liable for the tortious acts or omissions of its employee. *See* TEX. CIV. PRAC. & REM. CODE § 101.021.

The TTCA's election-of-remedies provision requires a plaintiff to make a choice between suing the governmental unit or its employee, depending on whether the employee was acting within her official capacity:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the

14

governmental unit as defendant on or before the 30th day after the date the motion is filed.

*Id.* § 101.106(f). The practical effect of this provision is that a plaintiff must decide, before filing suit, whether a governmental employee acted independently of her employment and thus is individually liable, or whether the employee acted in her official capacity such that the governmental unit is vicariously liable. *See Laverie*, 517 S.W.3d at 752.

The election-of-remedies provision "reduce[s] the delay and expense associated with allowing plaintiffs to plead alternatively that the governmental unit is liable because its employee acted within the scope of his or her authority but, if not, that the employee acted individually and is individually liable." *Univ. of Tex. Health Sci. Ctr. at Houston v. Rios*, 542 S.W.3d 530, 536 (Tex. 2017) (internal quotation marks and citation omitted). It does so by forcing "an irrevocable election *at the time suit is filed* whether to su[e] the governmental unit under the Tort Claims Act or proceed[] against the employee alone." *Id.* (emphasis in original; internal quotation marks and citation omitted).

A plaintiff therefore must determine whether the employee was acting in an official or individual capacity when she committed the allegedly tortious conduct. A governmental employee acts within her official capacity when she acts within the scope of her employment. *See Tex. Adjutant Gen.'s Off. v. Ngakoue*, 408 S.W.3d 350, 357 (Tex. 2013). If the plaintiff sues the governmental employee in her official

15

capacity, the suit is "in all but name only, a suit against the governmental unit." *Id.* In that situation, the TTCA's election-of-remedies provision entitles the defendant to an early dismissal "upon proof that the plaintiff's suit is (1) based on conduct within the scope of the defendant's employment with a governmental unit and (2) could have been brought against the governmental unit under the [TTCA]." *Laverie*, 517 S.W.3d at 752.

## C.    Dr. Lin's claims for defamation, slander, and libel

We first consider Dr. Lin's claims for defamation, slander, and libel. We consider those claims collectively, just as Dr. Lin does in her amended petition.

### 1.    Dr. Sharma made the allegedly tortious statements within the scope of her employment

Dr. Sharma contends the trial court erred by denying her motion to dismiss in part because she satisfied the first element of the TTCA's election-of-remedies provision when she established that she made the challenged statements within the scope of her employment by MD Anderson. *See id.*; *see also* TEX. CIV. PRAC. & REM. CODE § 101.106(f). We agree.

The TTCA defines "scope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to an employee by competent authority." *See* TEX. CIV. PRAC. & REM. CODE § 101.001(5). In determining whether an employee acted within the scope of employment, the

16

"critical inquiry" is whether, viewed objectively, there is a connection between the employee's job duties and the allegedly tortious conduct. *Garza v. Harrison*, 574 S.W.3d 389, 401 (Tex. 2019); *see also Laverie*, 517 S.W.3d at 753. "Simply stated, a governmental employee is discharging generally assigned job duties if the employee was doing his job at the time of the alleged tort." *Garza*, 574 S.W.3d at 401.

Whether an employee acts with ulterior motives, with personal animus, or in part to serve her own purposes is immaterial, so long as the employee was performing her job duties. *See Laverie*, 517 S.W.3d at 753; *Anderson v. Bessman*, 365 S.W.3d 119, 125–26 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Therefore, "co-existing motivations do not remove an employee's actions from the scope of his employment so long as the conduct also serves a purpose of the employer." *Fink v. Anderson*, 477 S.W.3d 460, 471 (Tex. App.—Houston [1st Dist.] 2015, no pet.). "Conduct that serves any purpose of the employer is within the scope of employment even if the conduct escalates beyond that assigned or permitted." *Id.* ("[F]or example, when an employee's job duties include making statements to prospective customers to induce them to buy from the employer, intentional misrepresentations may be within the scope of employment."); *see also Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96, 99 (Tex. 1994) (insurance agent was acting within scope of

employment when explaining terms of policy even though he made false representations about policy that employer did not authorize).

An employee who commits a tort like defamation can also be acting within her scope of employment so long as the tort occurs while the employee is engaged in conduct to further her employer's purpose and the act is an escalation of, rather than a deviation from, her job duties. *Fink*, 477 S.W.3d at 467–69; *see also Elias*, 2018 WL 3233587, at *9 (city employees who allegedly defamed plaintiff while giving city-council update were acting within scope of employment); *Melton v. Farrow*, No. 03-13-00542-CV, 2015 WL 681491, at *3 (Tex. App.—Austin Feb. 10, 2015, pet. denied) (mem. op.) (board members who allegedly defamed plaintiff in board meeting were acting within scope of employment); *Hopkins v. Strickland*, No. 01-12-00315-CV, 2013 WL 1183302, at *4 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.) (mayor who allegedly defamed plaintiff in conversation with another mayor was acting within scope of employment).

The relevant question is not whether the employee was authorized by her employer to commit the specific act that forms the basis of the plaintiff's tort claim, but whether she was performing her job duties when she committed the alleged tort. *See Fink*, 477 S.W.3d at 470 ("More recent cases likewise have broadened the focus to ask whether the general conduct was within the scope of employment instead of whether the specific act was somehow wrongful."); *see also Celtic Life Ins.*, 885

18

S.W.2d at 99 (in agency relationship, question is not whether principal authorized specific wrongful act because then principals would rarely be liable for agents' misconduct; rather, proper inquiry is whether agent was acting within scope of agency relationship when committing wrongful act).

By contrast, when an employee pursues an "independent course of conduct" unrelated to her job that does not serve any purpose of her employer, she engages in that conduct for her own reasons and is not acting within the scope of employment. *See Laverie*, 517 S.W.3d at 754. An employee who deviates from the general nature of her employment to engage in unauthorized conduct is also not acting within the scope of employment. *See Zarzana v. Ashley*, 218 S.W.3d 152, 160 (Tex. App.— Houston [14th Dist.] 2007, pet. struck) (employee's selling counterfeit car inspection stickers was not within scope of employment because employer did not conduct inspections or sell car inspection stickers); *see also Fink*, 477 S.W.3d at 467.

We conclude Dr. Sharma was acting within the scope of her employment, rather than pursuing an independent course of conduct, when she made the allegedly defamatory statements. Dr. Lin contends the statements fall into three categories: statements made to third parties like the journals *Cancer Immunology Research* and *JCI Insights*; statements made as part of MD Anderson's investigation of the authorship dispute; and statements made to other MD Anderson employees. But regardless of which category they fall into, it is undisputed that all of Dr. Sharma's

allegedly defamatory statements concerned the TLS Research and who should receive attribution for it. It was within the scope of Dr. Sharma's employment to make these statements.

MD Anderson has instituted formal policies governing the conduct and publication of research, as well as attribution for it. MD Anderson Policy RES3535, entitled "Principles for Scientific Research Policy," requires that "[p]roper credit through authorship or acknowledgement must be given for the nature and scope of contributions or collaborating faculty, students, or staff." Likewise, MD Anderson Policy RES3532, entitled "Scientific Publication Policy," defines various kinds of authorship and states that "[a]ll persons who satisfy the conditions for Authorship Credit should be designated as an Author." Within her responsibilities as a senior researcher, professor, vice president, and director of scientific programs at MD Anderson, Dr. Sharma has an interest in ensuring these policies are followed and proper attribution given to those who contributed to the research, particularly in light of the MD Anderson resources that were used to conduct it. As Dr. Draetta stated in his declaration, "Dr. Sharma acted within the course and scope of her employment with [MD Anderson] in her attempts to resolve the authorship dispute with Dr. Lin and in relation to both the CIR Manuscript and the [JCII] Manuscript."

Resolving authorship disputes among MD Anderson researchers regarding research that utilized MD Anderson resources facilitates the ultimate publication of

20

the manuscripts, thereby benefitting MD Anderson because the publication adds the scholarship of MD Anderson researchers to the scientific community. The importance to MD Anderson of resolving the authorship dispute is demonstrated by MD Anderson's authorizing an independent investigation into the authorship dispute in 2022 and adopting the findings of the investigation as its "institutional position" regarding who should get what level of authorship recognition.

Dr. Lin contends Dr. Sharma's comments were an "attempt to sabotage and destroy a fellow employee's promising medical career." But even assuming that statement is true, Dr. Sharma's motives are irrelevant to the scope-of-employment inquiry. *See Laverie*, 517 S.W.3d at 753; *Anderson*, 365 S.W.3d at 125–26. Instead, the "critical inquiry" is whether Dr. Sharma was "doing h[er] job at the time of the alleged tort." *Garza*, 574 S.W.3d at 401. The attempt to resolve the authorship dispute concerning the TLS Research was within the scope of her employment as a senior researcher at MD Anderson.

Dr. Lin also contends Dr. Sharma was acting outside the scope of her employment because the challenged statements did not serve any purpose of MD Anderson. *See Fink*, 477 S.W.3d at 471 (conduct is within scope of employment "so long as the conduct also serves a purpose of the employer"). Dr. Lin argues that because the Board of Regents of the University of Texas System owns the intellectual property rights to research done by MD Anderson researchers, "MD

21

Anderson's business interest is unaffected by who receives authorship credit for Dr. Lin's research." From there, she concludes Dr. Sharma's comments were made solely in her interest in the "share of professional prestige" she receives rather than for any purpose of MD Anderson.

This argument overlooks the myriad interests MD Anderson has in ensuring proper attribution is given for research, such as talent retention. As Dr. Lin concedes, publication in scientific journals "is important for [the careers of researchers] and establishing their reputations within the medical research community." And the statements Dr. Sharma made to Dr. Lin and other colleagues about who should be listed as inventors on the IDR regarding the TLS gene signature were clearly made in the scope of her employment with MD Anderson because the IDR is a document submitted to MD Anderson.[2]

Dr. Lin next points to Dr. Sharma's statement to the editor of *Cancer Immunology Research* that "there will be ongoing reviews internally at MD Anderson related to the work in this manuscript and the appropriate credit for authors." According to Dr. Lin, this statement suggests there was an ongoing review at the time Dr. Sharma made it (November 2021), whereas MD Anderson's formal

---

[2] Moreover, before and during this dispute, MD Anderson has had an "Intellectual Property Policy" which governs the commercialization of intellectual property and when intellectual property must be disclosed to MD Anderson. This policy states, "The decision whether to develop and commercialize Intellectual Property is in the sole discretion of the President of MD Anderson."

review did not begin until December 2022. Dr. Lin contends this statement shows Dr. Sharma was acting outside the scope of her employment because she made it "outside any formal MD Anderson process" and "Dr. Sharma's general duties do not include lying about her employer's activities."

Assuming Dr. Sharma sent the emails prior to the start of MD Anderson's "formal review," that fact would not remove them from the scope of her employment. For the reasons we explained above, Dr. Sharma's job duties include taking steps to ensure appropriate authorship credit, consistent with MD Anderson policies. Dr. Lin cites no authority, and we have found none, to suggest those steps must be taken within the context of an employer's "formal" review process to fall within the scope of employment. To the contrary, "[c]onduct that serves any purpose of the employer is within the scope of employment." *Fink*, 477 S.W.3d at 466. And Dr. Sharma's emails, sent for the purpose of ensuring appropriate authorship credit, served MD Anderson's purposes.

Likewise, even if we were to assume Dr. Sharma's statement that there "will be" internal reviews was false or defamatory, neither of those characterizations would remove it from the scope of her employment.[3] "[A]n act may still be within

---

[3]     In their briefing, the parties dispute whether MD Anderson's review had begun as of the time Dr. Sharma sent her email to the editor of *Cancer Immunology Research*, and thus whether her statement was factually accurate. But in considering a motion to dismiss under the TTCA's election-of-remedies provision, we "may not weigh the claims' merits." *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002)

23

the scope of the employee's duties even if the specific act that forms the basis of the civil suit was wrongly or negligently performed, so long as the action was one related to the performance of his job." *Hopkins*, 2013 WL 1183302, at *3 (affirming dismissal of former police chief's slander and malicious prosecution claims against mayor because mayor made allegedly slanderous comments within scope of his employment as mayor).

Both the Supreme Court of Texas and this Court have consistently held that a government employee's comments are not made outside the scope of employment simply because they were defamatory, so long as the employee was "doing h[er] job at the time of the alleged tort." *Garza*, 574 S.W.3d at 401; *see Rios*, 542 S.W.3d at 532, 535–36 (rendering judgment dismissing defamation claims by resident physician against faculty physicians at the University of Texas Health Science Center at Houston, based on comments faculty physicians made about resident to Texas Medical Board and others, because faculty physicians made the challenged statements "in connection with their operation of [the Center's] residency program" and thus "squarely within the scope of their employment at the Center"); *Laverie*, 517 S.W.3d at 750, 752–53 (rendering judgment dismissing Texas Tech professor's

---

(courts do not consider merits of plaintiffs claims in deciding a plea to the jurisdiction); *Elias*, 2018 WL 3233587, at *5 (motion to dismiss under TTCA's election-of-remedies provision is procedurally similar to plea to the jurisdiction). And for the reasons explained in the main text, the truth or falsity of Dr. Sharma's statement is immaterial to the scope-of-employment analysis.

defamation claim against colleague based on statements colleague made during search for new dean of business school because colleague made the challenged statements within the scope of her employment, regardless of colleague's "subjective intent" in making the statements"); *Ferebee v. Law Office of Frank Powell*, No. 01-22-00681-CV, 2023 WL 5918110, at \*1, 4–5 (Tex. App.—Houston [1st Dist.] Sept. 12, 2023, no pet.) (mem. op.) (rendering judgment dismissing slander claims against city attorney based on statements he made during city council meeting because city attorney was "doing his job at the time of the alleged tort," regardless of whether city attorney "was authorized to make defamatory comments," "had ulterior motives, acted with personal animus, or acted to serve his own purposes"); *Elias*, 2018 WL 3233587, at \*7–9 (city employees were acting within scope of employment when they made allegedly defamatory statements during presentation to city council).

Thus assuming Dr. Sharma's statements were knowingly false at the time they were made, she nevertheless made them within the scope of her employment. *See Fink*, 477 S.W.3d at 466 ("[W]hen an employee's job duties include making statements to prospective customers to induce them to buy from the employer, intentional misrepresentations may be within the scope of employment.").

Dr. Lin's reliance on *Cai v. Chen* to support the contrary conclusion is misplaced. 683 S.W.3d 99 (Tex. App.—Houston [14th Dist.] 2022, pet. granted,

25

judgm't vacated w.r.m.). In that case, Li Cai and Jasper Chen were colleagues at MD Anderson. *Id.* at 101. Chen sued Cai for defamation, alleging she made two kinds of defamatory statements about him. *Id.* First, Chen alleged Cai falsely reported to her supervisor that Chen had sexually harassed Cai and made false statements about Chen during MD Anderson's investigation of the alleged harassment. *Id.* Second, Chen alleged Cai made false statements about him to other colleagues with whom they both worked. *Id.* Cai sought dismissal under the TTCA's election-of-remedies provision, arguing she made the allegedly defamatory statements within the scope of her employment. *Id.* at 101–02.

The Fourteenth Court of Appeals reached a bifurcated result. With one justice dissenting, the Fourteenth Court concluded Cai's statements made to report the alleged harassment to her supervisor and within the context of MD Anderson's investigation were made within the scope of her employment. *Id.* at 104–05. But the court also concluded Cai's statements about Chen "to a co-worker in the lab where they worked," which "do not appear related to a report about sexual harassment" or "in any way connected to Cai's job duties for [MD] Anderson," were not made within the scope of Cai's employment. *Id.* at 105–06. The dissenting justice agreed with the majority that Cai's reports of the alleged sexual harassment were made within the scope of her employment, but he "disagree[d] with the majority's holding that an employee's disparaging comments to a coworker about

26

another coworker, made at the place of employment in the employment setting, are not 'within the general scope of that employee's employment.'" *Id.* at 107 (Wise, J., dissenting) (quoting TEX. CIV. PRAC. & REM. CODE § 101.106(f)).

Here, Dr. Lin contends "Dr. Sharma's communications with third party journal editors are even farther afield from her job duties than the statements to a co-worker in *Cai*," and therefore "Dr. Sharma's premature outreach to journals before any official process started is clearly beyond the scope of her role as an MD Anderson faculty member." But the Fourteenth Court held Cai's comments to her co-worker—comments to the effect that Chen was "very mean" and "a scary, intimidating person" whom "everyone should stay away from"—were unrelated to both her allegations of sexual harassment and her "job duties for [MD] Anderson" and thus they "do not appear to fall under [MD] Anderson's policy." *Id.* at 105–06. By contrast, Dr. Sharma's challenged statements relate to the authorship attribution for research manuscripts, which is a topic addressed directly by MD Anderson policies.[4] Dr. Sharma's emails to journal editors at most were an "escalation" of her duties and not a "deviation" from them. *See Fink*, 477 S.W.3d at 466–67 ("Conduct

---

[4] In making this observation, we do not suggest that a governmental employee's allegedly defamatory statement must be addressed directly by a written policy of her employer to be made within the scope of employment. But here, Dr. Sharma's challenged statements fall squarely within and in furtherance of MD Anderson Policies RES3532 and RES3535, which shows she made them while acting within the scope of her employment. *See Laverie*, 517 S.W.3d at 753.

that serves any purpose of the employer is within the scope of employment even if the conduct escalates beyond that assigned or permitted.").

Finally, Dr. Lin contends Dr. Sharma's statements were made outside the scope of her employment because "MD Anderson, unsurprisingly, neither authorizes nor condones defamatory statements." But "[o]ur inquiry is not whether the employee was authorized to commit a tort but whether he was performing his job duties when he committed the tort." *Ferebee*, 2023 WL 5918110, at *2.

We conclude Dr. Sharma made the challenged statements within the scope of her employment.

### 2. Dr. Lin's claims could have been brought under the TTCA

Dr. Sharma next contends she satisfied the second element of the TTCA's election-of-remedies provision, that Dr. Lin's claims "could have been brought against the government under the [TTCA]." *Laverie*, 517 S.W.3d at 752. Again, we agree.

A plaintiff's suit "could have been brought" against a governmental unit "under" the TTCA if: (1) the plaintiff alleges a tort claim; and (2) the claim is not brought under any other statute that waives immunity, even if the alleged tort is one for which the TTCA does not waive immunity. *Franka v. Velasquez*, 332 S.W.3d 367, 375 (Tex. 2011).

Both conditions are satisfied here. Dr. Lin's claims for defamation, slander, and libel are tort claims, and she did not assert a tort under any other statute that waives immunity. Therefore, Dr. Lin could have brought her claims against MD Anderson under the TTCA. *See id.*; *see also Elias*, 2018 WL 3233587, at *10 (slander-per-se claim could have been brought against governmental unit "under" TTCA).

Dr. Lin contends otherwise because the TTCA expressly excludes intentional torts and by its terms waives immunity only for tort claims seeking recovery for "property damage, personal injury, and death." *See* TEX. CIV. PRAC. & REM. CODE § 101.057(2) ("This chapter does not apply to a claim . . . arising out of assault, battery, false imprisonment, or any other intentional tort[.]); *id.* § 101.021(1) (waiving governmental immunity for "property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of employment if [certain conditions are satisfied]"). According to Dr. Lin, her claims are intentional torts that seek recovery for reputational damage, and thus they are outside the TTCA's immunity waiver and therefore could not have been brought against MD Anderson "under" the TTCA.

The Supreme Court of Texas has recognized that "*any tort claim* against the government is brought 'under' the [TTCA] for purposes of section 101.106 [the TTCA's election-of-remedies provision], *even if the [TTCA] does not waive*

*immunity.*" *Franka*, 332 S.W.3d at 375 (emphasis added). Relying on *Franka*, this Court has rejected Dr. Lin's argument. *See, e.g.*, *Hopkins*, 2013 WL 1183302, at \*4 ("[A]ll common-law tort theories alleged against a governmental unit, even if not waived under the [TTCA], are assumed to be 'under the [TTCA],' because it is the Act that delineates governmental tort liability." (citing *Franka*, 332 S.W.3d at 375)).

Dr. Lin contends *Franka* is not controlling because it involved claims of medical malpractice and thus "did not address the specific situation we face here, where the [TTCA] expressly excludes the type of claim at issue." She is correct that *Franka* itself did not involve an intentional tort. 332 S.W.3d at 370. But in earlier cases on which *Franka* relied, the Supreme Court of Texas rendered judgment for governmental employees after concluding that intentional-tort claims were subject to dismissal under the TTCA's election-of-remedies provision. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 659 (Tex. 2008) (addressing defamation claim and stating that "all tort theories," including intentional torts, "are assumed to be 'under [the Tort Claims Act]' for purposes of Section 101.106." (brackets in original)) (discussed in *Franka*, 332 S.W.3d at 377–79); *Newman v. Obersteller*, 960 S.W.2d 621, 622–23 (Tex. 1997) (intentional infliction of emotional distress and conspiracy to intentionally inflict emotional distress) (discussed in *Franka*, 332 S.W.3d at 375–76); *see also Alexander v. Walker*, 435 S.W.3d 789, 791–92 (Tex. 2014) (rendering judgment dismissing officers in case

30

alleging intentional torts of assault, conspiracy, slander, false arrest, false imprisonment, and malicious prosecution). Accordingly, our precedent has interpreted the holding of *Franka* to include intentional torts, and we follow that interpretation here. *See Ferebee*, 2023 WL 5918110, at \*6; *Hopkins*, 2013 WL 1183302, at \*3.

We conclude Dr. Lin's defamation, libel, and slander claims could have been brought against MD Anderson under the TTCA.[5]

## D.     Section 101.106(f) does not violate the Open Courts provision

Dr. Lin also contends interpreting section 101.106(f) to include defamation and other intentional torts would violate the Open Courts provision of the Texas Constitution. *See* TEX. CONST. art. I, § 13. She argues that if a plaintiff's defamation claim against a government employee is subject to dismissal under section 101.106(f), she will be left with an intentional-tort claim against the governmental employer for which immunity is not waived, leaving her "without a remedy." *See* TEX. CIV. PRAC. & REM. CODE § 101.057(2). According to Dr. Lin, this "construction will effectively deny plaintiffs that are defamed by government employees access to the courts," in violation of the Open Courts provision.

---

[5]     At oral argument, Dr. Lin's counsel conceded that her claims for theft and conversion are based on conduct within the scope of Dr. Sharma's employment and thus that those claims should be dismissed under section 101.106(f).

31

In *Franka*, the Supreme Court, while recognizing no constitutional challenge had been raised, anticipated that litigants would make Open Courts challenges to its holding:

> We recognize that the Open Courts provision of the Texas Constitution "prohibits the Legislature from unreasonably abrogating well-established common-law claims," but restrictions on government employee liability have always been part of the tradeoff for the [TTCA's] waiver of immunity, expanding the government's own liability for its employees' conduct, and thus "a reasonable exercise of the police power in the interest of the general welfare."

332 S.W.3d at 385 (footnotes omitted).

Following *Franka*, we have rejected Open Courts challenges to section 101.106(f). In *Williams v. Nealon*, the plaintiff argued section 101.106(f) required "him to give up an actionable malpractice claim against the doctors individually 'for a potentially dismissable [sic] and non-viable claim under'" the TTCA. 394 S.W.3d 9, 12 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). We rejected that argument, explaining that, "[i]n exchange for the [TTCA's] waiver of sovereign immunity in certain situations, the statute limits a litigant's cause of action against employees of the state acting in the course and scope of their employment." *Id.* at 13–14. We held this restriction is "a reasonable exercise of the police power in the interest of the general welfare." *Id.* at 14 (quoting *Franka*, 332 S.W.3d at 385); s*ee also Elias*, 2018 WL 3233587, at *10 (rejecting plaintiff's argument that dismissal of his slander-per-se claim under section 101.106(f) would violate Open Courts

provision because "[w]e have previously considered this same constitutional challenge to section 101.106(f) on several occasions and have found it to be without merit"); *Harold v. Carrick*, No. 01-12-00175-CV, 2013 WL 4828744, at *3 (Tex. App.—Houston [1st Dist.] Sept. 10. 2013, pet. denied) (mem. op.) (rejecting Open Courts challenge to section 101.106(f) because the TTCA's limitation on "a litigant's cause of action against employees of the state acting in the course and scope of their employment" is "a reasonable exercise of the police power in the interest of the general welfare" (quotations omitted)).  Accordingly, application of section 101.106(f) to Dr. Lin's claims does not violate the Open Courts provision.[6]

### E.      Dr. Lin's declaratory-judgment claim

Dr. Sharma also contends she was entitled to dismissal of Dr. Lin's declaratory-judgment claim.  Dr. Lin seeks a "declaration against Dr. Sharma individually and specifically naming Dr. Lin as senior, co-corresponding author of the JCII Manuscript in accordance with [Texas Civil Practice and Remedies Code Section] 37.003, and confirming that Dr. Sharma was not the author."

---

[6]     While it can lead to seemingly harsh results, the fact that a plaintiff might be denied the right to bring an otherwise viable claim against a governmental entity is a function of sovereign immunity: "Simply described, sovereign immunity generally shields our state government's 'improvident acts'—however improvident, harsh, unjust, or infuriatingly boneheaded these acts may seem—against the litigation and judicial remedies that would be available if the same acts were committed by private persons." *Bacon v. Tex. Hist. Comm'n*, 411 S.W.3d 161, 172 (Tex. App.—Austin 2013, no pet.).

The Texas Uniform Declaratory Judgments Act ("UDJA"), under which Dr. Lin brings her claim for declaratory relief, confirms that "[a] court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." TEX. CIV. PRAC. & REM. CODE § 37.003(a). But "the UDJA . . . 'does not enlarge a trial court's jurisdiction, and a litigant's request for declaratory relief does not alter a suit's underlying nature.'" *Collier v. Suhre*, 605 S.W.3d 699, 704 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 370 (Tex. 2009)). In other words, the UDJA is "a procedural device for deciding cases already within a court's jurisdiction." *Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 916 (Tex. 2015) (quotation omitted). "A party cannot, therefore, circumvent the bar of sovereign immunity by simply characterizing the suit as a declaratory judgment action when sovereign immunity has not been waived for the relief actually sought." *Koch v. Tex. Gen. Land Off.*, 273 S.W.3d 451, 455 (Tex. App.—Austin 2008, pet. denied).

Dr. Lin's declaratory-judgment claim violates this rule. It asks the trial court to declare the truth of the factual allegations comprising her theft and conversion claims, as shown by the following comparison:

| Theft/Conversion Allegations | Declaratory-Judgment Claim |
| --- | --- |
| "Dr. Lin was/is entitled to the possession (and in fact had legal possession) of the | Seeking declaration "specifically naming Dr. Lin as senior, co- |

| Theft/Conversion Allegations | Declaratory-Judgment Claim |
|---|---|
| research, analysis, and findings in the JCII Manuscript evidenced by the fact that Dr. Lin relentlessly assisted in the research and analysis, and drafted significant portions of the JCII Manuscript." | corresponding author of the JCII Manuscript." |
| "Dr. Sharma continues to unlawfully possess or is thereby preventing publication of the JCII Manuscript despite the fact that Dr. Lin conducted the research, analysis, and drafting of the JCII Manuscript." | Seeking declaration that "Dr. Sharma was not an author" of the JCII Manuscript. |
| "Dr. Lin conducted the necessary research and analysis to draft the JCII Manuscript . . . . Dr. Sharma unlawfully appropriated the JCII Manuscript without Dr. Lin's consent and with the intent to permanently deprive Dr. Lin of the correct authorship attribution of the JCII Manuscript." | Seeking declaration "specifically naming Dr. Lin as senior, co-corresponding author of the JCII Manuscript . . . and confirming that Dr. Sharma was not an author." |

Dr. Lin's declaratory-judgement claim is coextensive with her theft and conversion claims, because all of them are based on the same set of alleged facts and effectively request the same relief. Her claim for declaratory relief merely restates her theft and conversion claims by asking the trial court to determine the parties' property rights in the JCII Manuscript. *See Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 390 (Tex. 2011) ("The central test for determining jurisdiction is whether the 'real substance' of the plaintiff's claims falls within the scope of a waiver of immunity from suit.").

Dr. Sharma is thus immune to Dr. Lin's declaratory-judgment claim for the same reason she is immune to Dr. Lin's theft and conversion claims, claims Dr. Lin concedes are subject to dismissal under section 101.106(f). Because her declaratory-judgment claim merely recasts her theft and conversion claims as a request for declaratory relief, it is likewise subject to dismissal under section 101.106(f). *See City of Dallas v. Groden*, No. 05-15-00033-CV, 2016 WL 1367380, at *8 (Tex. App.—Dallas Apr. 6, 2016, pet. denied) (mem. op.) ("[W]e previously concluded in our analysis of Groden's tort claims that he did not allege any actions by Golbeck and Worden that were outside the general scope of their employment [for purposes of section 101.106(f)], and Groden complains about those same actions in his claim for declaratory relief. Groden may not avoid dismissal of his claims for which Golbeck and Worden have immunity by filing the claims in the form of a request for declaratory relief."); *see also Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 859–60 (Tex. 2002) (where state agency had immunity from breach-of-contract claim, it also had immunity to declaratory-judgment claim that effectively recharacterized breach-of-contract claim for declaratory relief); *City of Eagle Pass v. Wheeler*, No. 04-07-00817-CV, 2008 WL 2434228, at *5 (Tex. App.—San Antonio June 18, 2008, no pet.) (mem. op.) ("Because Wheeler's declaratory judgment claim against the City merely recasts the intentional tort claims from which the City retains immunity from suit, the trial court lacked jurisdiction

and erred in denying the City's plea."); *Koch*, 273 S.W.3d at 455 ("[T]he Texas Tort Claims Act governs when immunity is waived for a plaintiff's tort claims, . . . and a plaintiff cannot circumvent a state official's immunity from suit by recasting a defamation claim as a claim for declaratory relief[.]" (internal citation omitted)).

We conclude the trial court erred in denying Dr. Sharma's motion to dismiss Dr. Lin's declaratory-judgment claim, and we sustain Dr. Sharma's sole issue on appeal.

## Conclusion

We reverse the trial court's order denying Dr. Sharma's motion to dismiss and render judgment dismissing with prejudice Dr. Lin's claims against her.


                                                       Andrew Johnson
                                                       Justice

Panel consists of Justices Guerra, Guiney, and Johnson.